**G.W. GREEN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 60133.**

Court of Criminal Appeals of Texas, En Banc.

July 11, 1984.

Rehearing Denied Sept. 26, 1984.

Certiorari Denied March 4, 1985.
See 105 S.Ct. 1407.

1. 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

2. See *Moore v. State*, 542 S.W.2d 664 (Tex.Cr. App.1976) and its progeny.

Gregory L. Hennig, Houston, for appellant.

James H. Keeshan, Dist. Atty., and Michael A. McDougal, Asst. Dist. Atty., Conroe, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

A jury found appellant guilty of capital murder and answered the three special issues affirmatively. Punishment was assessed at death. See Art. 37.071, V.A.C.C.P.

Appellant asserts thirty-one grounds of error. In his nineteenth ground appellant contends that the trial court erred in excusing several prospective jurors.

This ground of error appears to be based upon two separate contentions: that the trial court struck certain prospective jurors because they said that it would be difficult for them to impose the death penalty upon one "convicted solely under the association of the law of parties when such person might not have actually committed the actual physical act;" and that the trial court improperly struck certain prospective jurors after they stated that they did not believe in the death penalty.

Appellant neither names these "certain prospective jurors" nor cites where the alleged error may be found in the record. He cites no cases in support of his legal contentions. Despite these obstacles, we will address the issue.

■ A careful reading of the record shows appellant's contentions to be without merit. Many of the prosecutor's questions concerned the veniremembers' feelings about *subjecting* a defendant to the possibility of the death penalty, when he was convicted by applying the law of parties and was not himself the triggerman. No veniremember was excused for an answer to these questions. If appellant now complains of the *questioning* upon this subject, we note that appellant did not object to any question concerning application of the law of parties to the death penalty. Failure to object waives error, if any, that is presented. *Meanes v. State,* 668 S.W.2d 366 (Tex.Cr.App.1983); *Evans v. State,* 656 S.W.2d 65 (Tex.Cr.App.1983); *White v. State,* 629 S.W.2d 701 (Tex.Cr.App.1981); *Russell v. State,* 598 S.W.2d 238 (Tex.Cr.App.1980).

Of the seven veniremembers struck because they stated that they did not believe in the death penalty, appellant objected to the striking of four. We will address only those to which objection was made. *White,* supra.

To the striking of venirewoman Talley appellant objected "on the basis of the unconstitutionality of the statute;" although appellant's three other objections are certainly not models of clarity, we understand them to allege a violation of the limitations upon exclusion established in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

In *Witherspoon* the United States Supreme Court stated:

> Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

The Supreme Court went on to say:

> ... nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, ...

391 U.S. at 522, 88 S.Ct. at 1777.

Venireman Grimes was examined as follows:

> "... I am going to ask you if you have any conscientious objections against the death penalty as a punishment for crime?
>
> "A. Yes, I do.
>
> "Q. Would you say you have a strong, personal conviction—
>
> "A. Yes.
>
> "Q. —against capital punishment?
>
> "A. Yes.
>
> "Q. You have had this conviction for a long time?
>
> "A. Yes, I have.
>
> "Q. Let me ask you if you can think of any fact situation where you would change that view and be in favor of the death penalty?
>
> "A. I doubt it. I do not think—
>
> "Q. Can't think of anything offhand. So it's a deep, personal opinion on your part—
>
> "A. Yes.
>
> "Q. —in opposition to the death penalty, which is all right. We are just entitled to know this sort of thing.
>
> "A. Yes.
>
> "Q. Would you say this is based on a long standing belief that you hold?
>
> "A. Yes, I would.
>
> "Q. When you say it has been with you a long time, firmly, you do not be wishy-washy about it?
>
> "A. No.
>
> "Q. Okay. Now, this trial has two phases and in the first part of the trial the jury just decides whether the defendant is guilty or not guilty of capital murder. The second part of the trial if the defendant is found guilty, then there would be two questions to ask of you. And you would have to answer those questions yes or no based upon the evidence. But you would know that if you answered both those questions yes, then the Judge would have to assess the penalty of death to the defendant. That would be mandatory by law. Let me ask you now, since your opposition to the death penalty is so strong and firm, do you think that this feeling that you have would influence your deliberations on these fact issues that I was talking about and whether you answered them yes or no?
>
> "A. I believe they would.
>
> "Q. In other words, it seems like most (sic) certainly would from what you say if your feeling is fairly strong in opposition to the death penalty; is that right?
>
> "A. Yes.
>
> "Q. So, in other words, you come forward and are being honest if you know two answers of yes will result in the death penalty for this defendant, this knowledge would influence you in the way you answer those fact questions?
>
> "A. Yes.
>
> "Q. It would be anything that you chose; it just would be a feeling that comes from within?
>
> "A. I believe so.
>
> "Q. Okay. And you are fairly certain about that?
>
> "A. Yes, I am.
>
> > "MR. WINFREE; At this time we would wish to challenge.

"EXAMINATION

"BY MR. HENNIG:

"Q. Mr. Grimes, do you follow the law?

"A. Do I follow it?

"Q. Do you follow the law?

"A. In what way?

"Q. As told to you, do you obey?

"A. Yes, I try to.

. . . .

"Q. (BY MR. HENNIG) Mr. Grimes, could you set aside your personal feelings if you believe the facts dictated beyond a reasonable doubt a feeling—excuse me—a verdict that might result in the death penalty?

"A. I don't see how I could set aside my feelings about this in any case.

"Q. Now, as the law you yourself never write life or death; do you understand that point?

"A. Yes, sir.

"Q. It is merely that you will answer certain questions yes or no based upon the facts as presented to you?

"A. (Witness nods.)

"Q. Can you answer those fact questions honestly throughout even knowing that their answers will influence the life or death penalty?

"A. Well, I would try to answer all the questions to the best of my ability. Is that what you are asking?

. . . .

"Q. (BY MR. HENNIG) Could you deliberate on the questions based solely upon the evidence presented to you?

"A. Yes.

"Q. And could you reach a conclusion based upon those deliberations?

"A. Yes, sir.

"Q. And would you return the answers in accordance with those deliberations alone?

"A. Yes.

"Q. Even though you have strong feelings against the death penalty?

"A. Yes, I do.

"Q. Could you answer questions presented to you by the Court depending solely upon the evidence?

"A. Yes.

"Q. Can you answer questions presented to you by the Court depending solely upon the evidence?

"A. Yes.

"Q. Can you answer these regardless of what outcome may be the result in punishment?

"A. I'm not sure I understand you. Now, what exactly are you saying?

"Q. Could you set aside the fact that the questions you may answer would affect the final outcome of life or death, knowing that life or death would be handed down by the Judge and not yourself in accordance with the law?

"A. Well, I don't quite know how to answer that. Are you saying that he—I'm not sure I understand you. I am sorry. Are you saying that if the Judge were to decide the penalty—

"Q. All right. Let me put it to you this way: There are two questions that you would probably hear in this case and this is after the guilt or innocence would have been established. Now, this is presuming that you still have the opposition between life and death at this point. Punishment has not determined, only the guilt or innocence. Can you determine guilt or innocence based upon the facts just up to that point based solely upon the facts as presented without letting how you feel about capital punishment determine—

"A. Yes, I believe so.

"Q. Okay. then if assuming that defendant was shown to be guilty, there would be two questions presented to you. Primarily, whether the conduct of the defendant was committed deliberately and with intentional and deliberate reasonable expectation that the death of the deceased would occur and the second question is whether or not there is a probability that the defendant would commit crime such as this of violence in the future, whether he would continue to be a criminal. Now, could you answer those questions based solely upon the

facts, knowing and keeping in mind the fact that a yes answer to both of these questions would mean that the Judge would assess a death penalty? Could you answer these questions yes based upon the facts as presented to you?

"A. Yes, I believe so.

. . . .

"Q. Mr. Grimes, I don't want to carry this thing out too far. I would like to inquire just a little bit further about this opposition you have against the death penalty. You said that you were firmly opposed to the death penalty as a punishment for crime and, of course, you are entitled to that belief. What we are trying to inquire now is how firm it is in your mind. Do you feel like it is so firmly held that whether you think the death penalty would be proper as a punishment for crime?

"A. No, I don't.

"Q. Is that right now. Okay. Now two questions that we are talking about would be asked of you in the punishment phase in the event the defendant was found guilty of a capital murder. Two yes answers would mean that the Judge would impose a sentence of death upon the defendant, of course, those questions should be answered by the evidence. But you would know that, you would know without a doubt if you answered both of them, then the defendant would get the death penalty. Would this knowledge that you have would that influence in any way your deliberations on those two questions of fact? Would it influence the way you answered them in any way?

"A. Yes, I believe it would. I mean if I thought a yes answer of those questions would result in the death penalty, yes, I believe so.

"Q. I am not saying that's the only thing you would think about because you still think about the facts. I just want to know about those facts if you answer these yes, he is going to get death. I am not opposed to that. All I want to know is do you feel certain that would be an influence upon you the way you answered those questions of fact presented on the punishment phase?

"A. Yes, I believe it would.

"Q. You have a strong opposition to the death penalty?

"A. Yes.

"Q. Now, can you think of a set of facts in any trial where this wouldn't be an influence by your opposition to the death penalty?

"A. No, it would always be there. Yes.

"Q. Because this is a firmly held opinion that you have?

"A. Right.

"Q. In other words, you would have to try to follow the law the best you could, but you can't be expected to put away your personal beliefs.

"A. That's right.

"Q. Is that right?

"A. Right.

"Q. That's asking a little too much, so you are telling us quite honestly then that you hold such a firm opposition to the death penalty that it couldn't help but influence your deliberations on these two questions, and even though you consider the evidence it would influence the way you answered them whether yes or no?

"A. I think so, this knowledge that death would result.

. . . .

"Q. If the facts presented themselves such that in your mind you believed that the State had proven the facts beyond a reasonable doubt to merit a yes answer to each of these two questions and if you knew by answering yes the death penalty would occur, could you still answer them yes in accordance with the question and in following the law?

"A. It would be hard to do, sir.

"Q. Can you conceive of the possibility that you could do it?

"A. No.

"Q. Under any circumstances whatever?

"A. Not that I could think of.

"Q. You could not answer the questions yes?

"A. If it meant a death penalty, no. I don't believe I could, if that's what you are asking.

"Q. Even though you believed the answers would be yes, you would still have to answer the questions no?

"A. Yes."

Venireman Cranford was examined as follows:

"Q. ... do you have any conscientious scruples against the death penalty?

"A. Yes, sir.

"Q. I want to ask you do you have pretty—

"A. I definitely do.

"Q. No question about it in your mind that you are fairly strong in—

"A. Right.

"Q. Let me go over this a little bit further with you.

"How long have you, do you think, held that belief in opposition to the death penalty?

"A. For a real long time.

"Q. A real long time and you have never waivered from it?

"A. No, sir.

"Q. It's a strong conviction, personal conviction, with you?

"A. I don't understand the question.

"Q. It's a strong personal feeling that you have in opposition to the death penalty?

"A. Yes.

"Q. And can you think of any set of facts at all where you would at any time feel the death penalty would be proper?

"A. I don't believe. I believe if I voted, I would be as guilty as the one I voted for.

"Q. In other words, you can't think of any situation where you would ever think the death penalty would be proper?

"A. No, sir.

"Q. Let me say that in a criminal trial, of course, the defendant is found guilty in the first part of the trial. Then you go on to the second part of the trial, which is the punishment part of the trial, you see. And then you would be asked two questions, two questions of fact. And if you answered both of those questions yes based on the evidence, then the Judge would assess a death penalty to this defendant. And this trial that we are in now, you see, what I mean?

"A. Yes, sir.

"Q. You understand how the system works, in other words. First part of the trial you find the defendant either guilty or not guilty. Then if he is, go to the second part of the trial. you see what I mean, sir? That's where you are asked those two questions; and if you answer them yes, then the defendant would be assessed a death penalty by the Court.

"A. I wouldn't answer one of them yes.

"Q. Are you saying that you wouldn't answer both of them so that you would be sure he wouldn't get the death penalty?

"A. Right.

"Q. So what you are saying is in every situation, bar none, your conviction is so strong that it would influence the way you answered those questions; is that right, sir?

"A. Yes, sir.

"Q. And it would, in fact, influence your deliberations on those questions of fact as to whether you answered them yes or not?

"A. Yes.

"Q. You would be certain they were answered so he would not get the death penalty?

"A. Yes, sir.

"Q. No matter what the evidence showed?

"A. No matter what the evidence showed.

"Q. And you can't think of a state of facts where you would vote yes based on the evidence and knowing that he would get the death penalty as a result?

"A. No, sir, I could not.

"Q. Okay, sir. I appreciate your frankness and honesty.

MR. WINFREE; Your Honor, we would challenge for cause.

"EXAMINATION

"BY MR. HENNIG;

"Q. Mr. Cranford, even though you may feel very much against the death penalty, do you feel so strongly that you would be opposed to giving a life sentence that you could give a life sentence *if it were asked rather than the death penalty?* Could you return a verdict where the defendant would obtain a life sentence?

"A. Well, I can't really say.

"Q. Can you think of any situation where you might if the facts—

"A. I might.

"Q. You might. But there is no situation in which you might answer the questions such as that would result in the death penalty, knowing that your answers would result in the death penalty?

"A. No, sir, I would not.

"Q. Okay. Now, it would be as such that the Judge would be the one to make the final order of the death penalty. It would be based upon the answers you gave and you yourself would never say life or death. You would simply answer questions based upon the facts yes or no. Would you be prevented in all cases from answering those questions honestly as to your beliefs if you knew the result would be the death penalty?.

"A. I couldn't say.

"Q. Would there be any case at all where you might be able to answer them yes just—would you be able to follow the law and answer them honestly? Is there a possibility of this happening?

"A. There could be.

"Q. So, you could answer these questions as such, there is a possibility that you could answer them honestly, even where the final result would be the death penalty, where not imposed; but you were just following the law in answering the questions.

"A. I think it would be the death penalty.

"Q. You wouldn't under any circumstances answer—

"A. (Witness shakes head.)

"Q. —answer the questions yes even if you believed the answers to be yes?

"A. No, sir."

Venireman Swearingen was examined as follows:

"... do you have any conscientious scruples against the death penalty?

"A. Yeah, I do.

"Q. Would you be basically opposed to the death penalty as a punishment for crime?

"A. Well, I never did believe in the death penalty to start with.

"Q. Yes, sir.

"A. And that is about all I can tell you in that line.

"Q. Well, I appreciate that and for you coming forward and being honest with us. That is certainly a determination to this case.

"Have you had that opinion in opposition to this death penalty for a long time?

"A. I have.

"Q. Probably as long as you can remember. And you probably talked to people and told them you are opposed to the death penalty; is that right?

"A. Yes.

"Q. And would this be based on some personal feeling you have, like may be (sic) your religious training or your personal moral feelings or just something you feel inside you or what?

"A. It's just something I feel inside.

"Q. It's just a personal opinion you have got, I guess, is that right?

"A. Right.

"Q. I want to ask you since you have this strong opinion in opposition to the death penalty, can you think of any case and, I guess, you would be opposed in all cases?

"A. I would, I think.

"Q. You would never think that it was proper in any case, no matter how bad the facts were?

"A. I don't think so.

"Q. When you say you don't think—you are entitled to be sure if you are sure.

"A. That's right.

"Q. You are entitled to your opinion. You don't have to change it for anybody.

"A. I see what you mean.

"Q. If you are opposed to it, that's fine and come on out and tell us, "look, I have been, always been, against it and always will be against it. You can't change my mind," in other words. That's how you feel; is that right?

"A. That's how I feel.

"Q. And having this feeling, you can't conceive of any set of facts right offhand in your mind where you would be willing to go forward with the death penalty?

"A. No, I don't think so.

"Q. Okay, sir. I want to ask you this: Now, let's say you were on this jury, picked on this jury, and the defendant was found guilty of capital murder; and you went on into the punishment part and in the punishment part you would have—you wouldn't have a place to check off life or death, rather you would be asked two questions and one of them pertaining to whether the conduct of the defendant was deliberate that caused the death of the dead person and the other one in all likelihood of the probability that the defendant will continue to commit criminal acts in the future. And you would know if you answered both of those questions yes, he is going to get the death penalty; the death penalty, you would know that.

"A. Uh-huh.

"Q. If you answered one or both of them no, then you get the life imprisonment from the Judge. I am presuming he has been found guilty. Can you think of any set of facts where you would answer if the evidence warranted answered them both yes, knowing that the defendant would get the death penalty?

"A. That he would get the death penalty?

"Q. Yes, sir. You would know two answers of yes means that he gets the death penalty from the Judge, always answer at least one of them to be sure that he wouldn't get—

"A. I think so, yeah.

"Q. What you are saying is that your opposition to the death penalty would

affect your deliberations on those fact questions; is that right?

"A. Uh-huh.

"Q. So, you would be opposed to answer those based on the answer but you are saying in addition to the evidence there would be an influence on your mind about the possibility that you knew that the death penalty might result from two yes questions?

"A. Right.

"Q. You are saying that would influence—

"A. Yes.

"Q. I think it would influence you—

"A. Uh-huh.

"Q. —clearly and definitely in any case you can think of?

"A. Uh-huh.

"Q. Can't think of any case where it wouldn't influence you?

"A. I don't think so because I don't believe in the death penalty.

"Q. I understand and appreciate that.

"MR. WINFREE: We will challenge for cause, Your Honor.

"MR. HENNIG: One question, your Honor.

"THE COURT: Yes, sir.

"EXAMINATION

"BY MR. HENNIG:

"Q. Mr. Swearingen, would you be able to follow the law as the Judge told you and would you be able to follow the law as the Judge told you the law was in answering your questions? Would you be able to follow the instructions of the Judge and answer questions honestly?

"A. Well, I think I would.

"Q. These questions wouldn't come to you to be answered yes or no until such time as the defendant had already been found guilty, so you wouldn't even have to think about that in the first part of the trial. All you have to worry about is whether he is guilty or not guilty. Could you return an honest opinion of guilty or not guilty?

"A. I think so, yeah.

"Q. Could you conceive of some situation in which you might be able to answer the questions yes just to follow the facts and to give an honest answer to those questions regardless of what punishment may occur?

"A. Yeah.

"Q. You could do that?

"A. I think so, yeah.

"Q. Fine.

"MR. HENNIG: I oppose that motion, Your Honor.

"MR. WINFREE: Question the juror farther.

## "EXAMINATION

"BY MR. WINFREE:

"Q. May be (sic) you misunderstood me. Let me rephrase that what he asked you was, can you see a state of facts where you would answer the questions yes based on the facts, knowing that the defendant would get the death penalty and not be influenced by your knowledge that he would get the death penalty?

"A. Come on, clarify that a little bit. If he asked me a question, me knowing that it should be answered yes—

"Q. What he meant was, I think, and I will let him clear it up if he needs to, what he meant to ask you was—maybe you misunderstood—was can you think of any set of facts where the evidence bore out an answer of yes or the evidence warranted an answer of yes to both questions, can you think of any set of facts where you would then answer yes, knowing that the direct result of your answers of yes would be, would mean the Judge would sentence the defendant to death?

"A. No."

▮ The prosecutor's questions asking whether a veniremember would be "influenced" by the knowledge that a defendant would be assessed the death penalty if the special issues were answered affirmatively does not provide a basis for excluding a prospective juror within the limitations established in *Witherspoon.* See *Adams v.*

*Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). However, all three veniremen indicated clearly that they would automatically answer the special issues "no" even if the evidence proved that "yes" was the proper answer. These veniremen were properly excluded within the limitations established in *Witherspoon.* See *Jernigan v. State,* 661 S.W.2d 936 (Tex.Cr. App.1983); *Hawkins v. State,* 660 S.W.2d 65 (Tex.Cr.App.1983).

Veniremember Talley was examined as follows:

"Q. ... Ms. Talley, do you have any particular personal, moral, or any other type of scruples against the death penalty as a punishment of crime?

"A. I just don't believe in it.

"Q. Don't believe in the death penalty at all? Would you say a strong moral—

"A. Yes. It is because I believe God is only the (sic) one that can take our lives.

"Q. I appreciate you answering if you were on this jury, of course, knowing that the death penalty would be a possibility as a possible in this case and knowing your strong opposition to which, of course, you are entitled to have—

"A. Uh-huh.

"Q. —your firm opposition to the death penalty as a matter of law as a matter of your own personal conscience, do you think that would interfere or that would be on your mind as, say, if deliberating the issue of whether the defendant was guilty of capital murder?

"A. I am afraid it would because I don't believe I could live with myself.

"Q. And just because of these firm principles and this feeling that you have in opposition to the death penalty, you feel that might influence you if you were a juror in this case? It might influence you as the way you saw the facts and the kind of verdict that particular strong feeling that you got?

"A. I'm afraid that it would have a great bearing. I am afraid it would.

"Q. We understand that. That's fine.

"And as far as your finding the defendant guilty of capital murder, that

feeling would influence your deliberations?

"A. Greater influence upon my judgment of it.

"MR. WINFREE: We will challenge for cause, Your Honor ..

"MR. HENNIG: Your Honor, may I ask a few questions?

"EXAMINATION

"BY MR. HENNIG:

"Q. Ms. Talley, the law as it is titled is such that the Court would instruct you first and first base guilt or innocent and this has nothing to do with punishment, nothing to do with the death penalty at this point. Could you find a person guilty of capital murder, guilty or not guilty at this point without hearing the facts?

"A. No.

"Q. Excuse me. Not without hearing the facts?

"A. No.

"Q. If upon hearing the evidence you believe the person is guilty, would you return a verdict of guilty in this case?

"A. In my way of thinking and my kind Christian belief, I could not. I couldn't be swayed. I just don't want to have that on my conscience to condemn anything to death.

"Q. I wasn't asking you in regards to the penalty. There are two portions of this trial: The original guilt stage, guilty or innocence stage and then the penalty stage. I am asking if you could find the person guilty upon the evidence or any—

"A. Any—

"Q. No—

"A. But I have read of this case, and I have a preconceived idea about it already. I have followed the case when it first came in the paper.

"Q. Do you have a belief in the guilt or innocence already developed in this case?

"A. I haven't given that thought whether I find someone guilty beforehand, before hearing the case. No. No, that I haven't. It's just my moral scruples.

"Q. Could you at this point hold an open mind regarding at that time guilt or innocence of the defendant based upon the evidence?

"A. I believe I could.

"Q. And could you return a verdict of guilty or innocence depending upon the evidence?

"A. Well, that depends on what outcome of the verdict would be.

"Q. Just on the guilt or innocence, the second stage would be punishment. I am just asking on guilt or innocence.

"A. Frankly, I couldn't say."

■ Appellant objected to the exclusion of venirewoman Talley "on the basis of the unconstitutionality of the statute," apparently referring to V.T.P.C., Sec. 12.31(b). Talley indicated initially that the fact that the death penalty was involved would influence her deliberations on the *guilt or innocence* of appellant. She ended up stating that her decision as to the guilt or innocence would depend on the outcome of the verdict and then stated that she just could not say whether she could return a verdict of guilty or innocent based upon the evidence. Talley's answers reveal that she could not base a verdict at the guilt-innocence stage upon the evidence. She was properly excluded because she was not a fair and impartial juror who would follow the law.

In two grounds of error appellant challenges the sufficiency of the evidence to support a finding of guilt.

On November 19, 1976 appellant, Joey Starvaggi, Ronald Bayer, and Glenn Martin drove to the home of John Denson. Appellant and Starvaggi went to the front door and rang the doorbell. Denson and his wife, Grace, were watching television when the doorbell rang; Mrs. Denson was dressed in her nightgown and housecoat so she started to go upstairs while Denson answered the front door. Grace Denson heard something, turned, and saw a man with a gun pushing his way through the door. She saw the shadow of another person behind the first.

Mrs. Denson ran upstairs to the master bedroom where her twelve-year old daughter, Susan, was watching television. Both of them got down beside the bed and Grace pulled a holstered gun from under the mattress as a man, identified by Grace Denson and Susan as Joey Starvaggi, came into the room. Mrs. Denson attempted to fire the gun but could not because the holster strap was secured around the hammer. Starvaggi pointed a gun at them and ordered them to lie down in front of the television. They did so and he threw a blanket over them and told them to lie still and they would not get hurt.

Susan testified that Starvaggi ran downstairs and she heard somebody say, " 'Shoot him.' 'Shoot him.' And then I heard a shot." Susan was not asked whether she could identify the voice.

Starvaggi came back and took Susan and Grace Denson downstairs, telling them to keep the cover over their heads. He told them to lie down in front of the television in the family room. Grace Denson testified that she heard her husband's voice but could not understand what he was saying.

While they lay on the floor under the blanket, Susan and Mrs. Denson heard sounds indicating the house was being ransacked. One of the intruders repeatedly demanded to know where the guns and money were while holding a gun to the back of Mrs. Denson's head and clicking the hammer.

Susan testified that she heard her father say, "I beg of you. Don't do this." She heard sounds of a struggle and then heard two shots. After those shots neither of them heard anything from John Denson.

Susan and Mrs. Denson were then bound with cords from the curtains and a voice that sounded like Starvaggi's said to them, "I killed your old man, you know. You had a good old man, you know." [1] Grace Denson also testified that one of the intruders had some kind of speech impediment and a lisp. He stood on her feet and said, "Kill them. Kill them. Aren't you going to kill them?" A voice that sounded like Starvaggi's responded, "No, I only kill pigs and dopers, but I don't shoot straights."

Susan testified that she heard someone say, "Shoot them. Shoot them." She did not testify that she knew this was a reference to her mother and herself.

Mrs. Denson and Susan were told to lie still for thirty minutes or the men would come back and kill them. Disobeying this command, they managed to untie themselves, run to a neighbor's house, and call the police, who found John Denson lying dead on the kitchen floor.

Doctor Donald R. Shepherd performed an autopsy on Denson. He testified that Denson had been shot three times. One of the bullets passed behind the collarbone and left clavicle, and beneath the second, third, and fourth ribs on the left side, rupturing them. The other two bullets passed through the heart causing John Denson's death.

Texas Ranger Wesley Styles testified that he investigated the murder. He interviewed Glenn Martin in jail on December 6, 1976. As a result of the interview, arrest warrants were issued for appellant, Starvaggi, and Bayer, and the guns taken in the robbery—including the gun used to kill John Denson—were recovered from the San Jacinto river.

Appellant's confession was read into evidence. It stated, in part:

On the nite (sic) of 11–19–76 I went to a resident west of Magnolia, Texas in the company of Glenn Martin, Joey Starvaggi and a person known only to me by the name of "Shadow." We went in two (2) cars, Glenn Martin and Joe Starvaggi in Martin's car, and "Shadow" and I in another. We left Martin's car at some side road and the four of us proceeded in one car. As we passed this house, Shadow said this was the one and we turned the car around and we stopped. It was decided that Joe and myself would ap-

1. Susan's version of this statement was "I killed your old man, you know. I didn't want to do it, but he made me. You had a good old man, you know."

proach the house on foot and try the front door. As I reached the front and opened it and a man grabbed me and we begin (sic) to struggle for the pistol. The length of time we fought, I cannot honestly say. Joe went upstairs and I called for him to come help as the man had turned the pistol into my stomach and pulled the trigger the pistol misfired on both times. I heard shots. The man fell to the floor. I then went to the front door and let Martin in and the car was pulled into the garage by, I believe, "Shadow". I then went into the living room and saw two females tied up. Joey and I went and removed one .30 caliber carbine and two (2) small caliber pistols from a gun case along with a quality (sic) of ammunition. At this time I would like to state that Joey shot the man two or three times with a pistol that he had took off the lady upstairs. After the guns were in the car the four of us left the house. On my way to the garage, I jerked the phone cord off. We then proceeded to Martin's car.... When we arrived home it was on news that person who was shot was a police officer. Martin came over the next morning 11–20–76 and we all agreed to dispose of the guns. Martin went and got the carbine back and Martin and myself went the next morning, 11–21–76, out Interstate 10 toward Baytown and got off at the Momouth exit and continued to go for approximately two miles at which we threw the rifle and pistols in the river....

Albert Pritchett testified that he had lent his pistol to appellant several times. The pistol was a Rossi revolver on which he had heated the main spring to weaken it so that he could pull the hammer back easily. Pritchett said that he had never fired the pistol himself. He also testified that he did not remember on what day he had last lent the pistol, but that appellant had returned

the pistol to him shortly before Pritchett heard about the killing of the police officer.

Pritchett said that when appellant returned the pistol he "just kind of looked at me and said it don't work." Pritchett also said that appellant flipped the gun open and showed him all five bullets and all five had been "crimped" on the detonator cap area, where the hammer had hit each bullet when the trigger was pulled.

A firearms expert, C.E. Anderson, testified that he had tested State's exhibit 18, a Rossi pistol, and that the gun would not fire because the main spring would not drive the hammer forward hard enough to ignite the round; however, the hammer would cause an indentation in the bullet.

 When reviewing the sufficiency of the evidence we consider whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Carlsen v. State,* 654 S.W.2d 444, 449 (Tex.Cr.App.1983) (Opinion on State's motion for rehearing). In circumstantial evidence cases, such as this, we review the evidence by analyzing it to see if it supports an inference other than the guilt of appellant. If the evidence does support an inference other than guilt then the finding of guilt beyond a reasonable doubt is not a rational finding. *Carlsen,* supra. The court charged on the law of parties as provided by V.T.C.A., Penal Code, Sec. 7.02(a)(2) & (b).[2] The foregoing facts, including the confession, reveal that appellant agreed to burglarize the Denson's house and rob them. Evidence of a conspiracy was presented. See V.T.C.A., Penal Code, Sec. 15.02. Appellant was a participant in the robbery during the course of which John Denson was murdered. Appellant entered the house armed with a gun. His confession was corroborated and substantiated by investigation. The evidence is sufficient to prove that appellant and his co-defendants planned

2. Sec. 7.02(b):

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

and carried out their plan to steal guns from the Densons. In light of these facts the murder "should have been anticipated as a result ..." of the armed burglary and robbery. We conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt and that the evidence reflects no reasonable hypothesis other than that appellant is responsible, under V.T.C.A., Penal Code, Sec. 7.02(b), for the capital murder of John Denson. The grounds of error are overruled.

Appellant attacks the sufficiency of the evidence to support the jury's affirmative finding under Art. 37.071(b)(1)[3] and the application of the law of parties to appellant at the punishment phase of the trial.

■ The state contends that the finding of "deliberateness" is supportable by application of the law of parties to this punishment issue. This contention is without merit for two reasons. First, the language of the statutes does not support the state's contention.

V.T.C.A. Penal Code, Sec. 7.01 entitled "Parties to Offenses" states:

(a) A person is criminally responsible as a party to an OFFENSE if the OFFENSE is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

(b) Each party to an OFFENSE may be charged with commission of the OFFENSE.

(c) All traditional distinctions between accomplices and principals are abolished by this section, and each party to an OFFENSE may be *charged and convicted* without alleging that he acted as a principal or accomplice.

V.T.C.A. Penal Code, Sec. 7.02, entitled "Criminal Responsibility for Conduct of Another" states:

(a) A person is criminally responsible for an OFFENSE committed by the conduct of another if:

. . . . .

(2) acting with intent to promote or assist the commission of the OFFENSE, he solicits, encourages, direct, aids, or attempts to aid the other person to commit the OFFENSE; ...

(b) If, in the attempt to carry out a conspiracy to commit one FELONY, another FELONY is committed by one of the conspirators, all conspirators are guilty of the FELONY actually committed, though having no intent to commit it, if the OFFENSE was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

The statutes clearly address *conviction* and *guilt* for an *offense.* Neither Sec. 7.01 nor Sec. 7.02 addresses the punishment phase of trial. Indeed, the language of the statute does not concern punishment at all. Rather, the Legislature enacted Art. 37.-071, V.A.C.C.P. specifically to cover punishment issues in a capital murder case. Those special issues do not define "offenses": they are tailored to guide a jury in examining the culpability and conduct of the individual defendant, and indeed must do so in order to comply with the guidelines set forth by the United States Supreme Court. *Lockett,* supra; *Woodson,* supra; *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

The State relies on *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App.1976) and *Livingston v. State,* 542 S.W.2d 655 (Tex.Cr.App. 1976) as authority for application of the law of parties to the punishment phase. In *Smith* and *Livingston* this Court found the evidence sufficient, through application of the law of parties, to sustain the *conviction,* not the findings upon the punishment issues. In *Smith* this Court found the evidence sufficient to support the affirmative answers to the special issues based upon the facts concerning the defendant's individual conduct. Smith also argued that

---

**3.** Art. 37.071(b)(1): Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result.

special issues one and three should not have been *submitted* in a case where the defendant is charged and convicted as a principal. The *Smith* opinion did not even discuss *application* of the law of parties to the punishment issues. Therefore, reliance on *Smith* and *Livingston* as authority for applying the law of parties to the punishment issues is misplaced and incorrect.

We addressed the law of parties issue in *Meanes v. State*, 668 S.W.2d 366 (Tex.Cr. App.1983). In *Meanes* we emphasized that the Supreme Court's decision in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) "does not prevent, under all circumstances, imposition of the death penalty against *one convicted*, as a party, of capital murder. *Enmund* prohibits assessment of the death penalty against any defendant who did not kill, attempt to kill, or intend or contemplate that life would be taken." *Meanes* at 375. We discussed the application of the law of parties to Art. 37.071(b)(1) and stressed that the special issues themselves clearly focus the jury's attention on the individual defendant, and indeed must do so in order to give the individualized examination required under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). While the law of parties can apply to *convict* an accused of capital murder, the death penalty may be imposed only by examination of the mitigating and aggravating circumstances concerning the *individual* defendant. *Lockett*, supra; *Woodson*, supra. This examination is performed in Texas through the special issues. *Enmund* clearly requires that the individual defendant be shown to be culpable due to his own actions, intentions, and expectations and not those of his cohorts. Id. at 102 S.Ct. 3378. Therefore we adopt Judge Clinton's concurrence that "it *is* error to apply di-

rectly the law of parties to any of the punishment issues in a capital murder case—that is, so a capital defendant may be punished for the deliberate conduct of another, the future dangerousness of another or the unreasonable response to provocation by another—without regard to the individual conduct of the defendant whose fate is in question." *Meanes* at 368–369.[4]

We hold that the law of parties may not be applied to the three special issues under Art. 37.071(b). *Wilder and Armour v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979) is overruled as far as it is inconsistent with this opinion.

Appellant challenges the sufficiency of the evidence to support the jury's affirmative finding under Art. 37.071(b)(1), V.A.C. C.P.

 In reaching its determination, the jury was entitled to consider all the evidence submitted during the guilt-innocence phase of trial. *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979); *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.1978). We in turn must review the evidence of appellant's participation and responsibility for the murder in order to determine whether that evidence supports the finding that "deliberateness" on the part of the individual appellant was proved beyond a reasonable doubt.[5] See *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

 The burden is on the state to prove each punishment issue beyond a reasonable doubt. Art. 37.071(c), V.A.C.C.P.

 The evidence of the "deliberateness of [appellant's] conduct that caused the death of the deceased" falls into four categories:

(1) Appellant's confession: Appellant admitted that he was a participant in the burglary committed during the course of

4. Upon request by a capital murder defendant or the State, the jury is to be instructed at the punishment phase that only the conduct of the defendant can be considered at the punishment phase, and that the instructions pertaining to the law of parties given at the guilt stage cannot

be considered. Appellant did not request any such charge in this case.

5. No evidence pertinent to this question was offered at the punishment stage.

which John Denson was shot and killed by Joey Starvaggi. Evidence of appellant's deliberate conduct concerning the death of John Denson includes several facts: he entered the house armed with a loaded gun; he and Denson struggled over the gun; when Denson managed to get the gun pointed at appellant's stomach appellant called to Starvaggi for help,[6] heard shots, and saw Denson fall to the floor, apparently wounded. Appellant's armed entry into the house and his struggle with Denson led to Denson's death.

(2) Susan Denson's testimony: Susan testified that an armed man entered the upstairs bedroom, ordered her and her mother to lie on the floor, and threw a blanket over them. She heard scuffling downstairs and the gunman ran back downstairs. Susan then heard someone say, "Shoot him. Shoot him." A shot was fired. Starvaggi and appellant were the only two intruders in the house at that time. There was no testimony specifically identifying the statement as either Starvaggi's or appellant's, however, as mentioned in footnote 5, supra, the only statement heard at that time was "Shoot him. Shoot him." In his confession appellant states that he called for help as he struggled with Denson. The obvious conclusion is that appellant's call was the one telling Starvaggi to shoot Denson.

(3) The speech impediment: Mrs. Denson testified that one of the intruders had a speech impediment or a lisp and that this intruder said, "Kill them. Kill them. Aren't you going to kill them?" Several witnesses testified that appellant spoke with a speech impediment or lisp; appellant's several witnesses testified that appellant did not have a speech impediment or lisp, but that one of the other defendants did have a speech impediment.

(4) Starvaggi's statement: Both Susan and Grace Denson testified that a man who sounded like Starvaggi told them, "I killed your old man. I didn't want to do it but he

made me." Starvaggi did not refer to appellant's role in the killing.

The evidence must be reviewed in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Art. 37.-071(b)(1) to have been proved beyond a reasonable doubt. See *Wilson v. State*, 654 S.W.2d 465 (Tex.Cr.App.1983). Then we must determine whether *the same* evidence supports an inference other than that appellant's conduct which contributed to causing the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result. If it does, a trier of fact could not reasonably find "yes" on special issue number one, and the punishment must be reformed to life imprisonment.

Susan Denson's testimony about hearing someone yell "Shoot him. Shoot him," immediately after she heard scuffling downstairs and saw Starvaggi run downstairs, taken together with appellant's confession wherein he states that he called to Starvaggi for help while struggling with Denson, supports the inference that appellant's "call for help" consisted of "Shoot him. Shoot him." There is no evidence of any other statements made at this time by anyone else. This conduct evinces "deliberateness" within the meaning of Art. 37.-071(b)(1) because this deliberate conduct by appellant ultimately led to Denson's death and was undoubtedly done with a reasonable expectation that if Starvaggi shot Denson, Denson would die. Although it could be argued that the call for help arose from exigence, the choice of remedies made by appellant did not.

Appellant willingly participated in a planned burglary, entered a house holding a loaded gun, which is itself of probative value in proving deliberateness, *Duffy*, supra, and told Starvaggi to shoot Denson. That conduct is itself sufficient to support

---

6. Susan Denson's testimony, discussed infra, that she heard someone say "Shoot him. Shoot him," coincides with the timing of appellant's call for help. Thus, the inference that appellant's "call for help" was a yell to Starvaggi to shoot Denson is a strong one.

the jury's affirmative answer to the deliberateness issue.

In addition, that one of the intruders, who spoke with a lisp or speech impediment, spoke of killing Susan and Grace Denson is of probative value on the deliberateness issue. Viewing the evidence in the light most favorable to the verdict, we may attribute this statement to appellant. Although the statement was directed toward Susan and Grace Denson, not John Denson, the inference that appellant yelled "Shoot him. Shoot him" is further strengthened by his later comment because it reflects appellant's mental state and the deliberate nature of appellant's conduct during the transaction.

Compare *Smith v. State*, supra, in which the evidence was found sufficient to support the affirmative answers to the special issues. Smith walked into a grocery store, pointed a gun at the deceased, saw the deceased make a motion "behind his jacket," and attempted to shoot the deceased. When his gun misfired, he called to his co-defendant who then shot and killed the victim. Smith's conduct demonstrated both the intent to kill and deliberateness even though he did not actually shoot the victim; appellant's conduct is quite similar. He also encouraged Starvaggi to kill Susan and Grace Denson. His conduct from beginning to end evinces "deliberateness" under Art. 37.071(b)(1). The ground of error is overruled.

Appellant also challenges the sufficiency of the evidence to support the jury's affirmative answer to special issue No. 2, Art. 37.071(b)(2).[7]

■ At the penalty stage of the trial, the jury may consider all of the evidence adduced at the guilt stage. *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983); *O'Bryan*, supra; *Duffy*, supra. In some cases the circumstances of the offense can alone sustain an affirmative answer to the second issue, Art. 37.071(b)(2). This is such a case.

■ Appellant participated in a planned burglary with the intent to steal deadly weapons. He carried a loaded gun in hand into the house. There is no evidence that appellant was under the influence or domination of anyone else. See *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978). On the contrary, he participated directly in the shooting of the victim and, after that deed had been done, urged his cohorts to kill the victim's wife and daughter. Additional evidence offered at the punishment stage showed that appellant had been previously convicted of the offense of carrying a pistol and that appellant's reputation for being law-abiding and peaceable was bad.

Appellant offered several witnesses who testified that appellant was a good worker, that he had been a foreman on some of the jobs he had worked, and that they would employ appellant immediately if he were not in jail. Appellant also called Ron Van Loon, a hypnotherapist and handwriting expert who said he determined people's characteristics by examining their handwriting. Van Loon testified that appellant was highly intelligent, optimistic, and had a mental capacity for small details. Van Loon stated that *if* appellant were rehabilitated he would be an asset to society.

On cross-examination Van Loon said that he would not want to see appellant loose in society now, but perhaps in 25–30 years after he had gone through rehabilitation training. He also admitted that appellant had the potential to be dangerous and would be a menace to society "[o]nly if he is allowed to go the way he has had to go since early childhood." The jury thus heard exacerbating as well as mitigating evidence from Van Loon.

Given the aggravating factors—including the circumstances of the offense, appellant's prior weapon's offense, his theft charge, the bad reputation testimony, and even Van Loon's testimony—the evidence, viewed in a light most favorable to the verdict, is sufficient for the jury to have

7. Art. 37.071(b)(2): Whether there is a probability that the defendant would commit criminal

acts of violence that would constitute a continuing threat to society.

found that the mitigating factors introduced by appellant did not outweigh the aggravating factors and that there is a probability that appellant would commit acts of violence that would constitute a continuing threat to society. *Russell,* supra; *O'Bryan,* supra; *Duffy,* supra. The ground of error is overruled.

Appellant also challenges the sufficiency of the evidence to support the jury's affirmative finding to special issue No. 3, Art. 37.071(b)(3).[8]

The only evidence suggesting provocation is Susan's testimony that Starvaggi said "I killed your old man.... I didn't want to do it, but he made me." Grace Denson testified to something slightly different. She testified only that Starvaggi said only "I killed your old man, you know. You had a good old man, you know." The jury was free to believe Grace Denson's version of the statement and not Susan's version. Indeed, even if the jury believed Susan's version, the clear implication of the statement that "he made me" was that the killing was in response to appellant's struggle with Denson at the door. Clearly, the jury would be free to find that the struggle was not reasonable provocation for killing Denson, especially in light of the passage of time between the first shot and the execution of the victim after he had been dragged into the kitchen. Examining the circumstances of the case in a light most favorable to the verdict we find the evidence sufficient to support the jury's finding to special issue No. 3. There simply was not much, if any, credible evidence even raising the issue. See *Hernandez v. State,* 643 S.W.2d 397, 401 (Tex.Cr.App. 1982).

Appellant complains of the trial court's refusal at a second pretrial hearing to "define the previous courts rulings" concerning appellant's discovery motion. Appellant claims error because he was "really not apprised of what I was granted and what I was not granted other than the orally—there was no written word entered.

I really am not aware of what I was denied."

The responsibility for getting his motion ruled upon lies with appellant. See *Hackbarth v. State,* 617 S.W.2d 944 (Tex. Cr.App.1981). If he was not certain of the court's rulings at the first pretrial he should have requested clarification at that time. Objecting at a second pretrial hearing in front of a different judge is not a timely objection. The ground of error is overruled.

In a similar ground appellant claims error in the introduction of the murder weapon because appellant had not previously examined the weapon and had filed a pretrial motion requesting that he be permitted to have his own expert examine the weapon. The record before us of the pretrial hearing contains no mention of this motion. The responsibility for bringing his motion to the attention of the court and obtaining a ruling lay with appellant. *Hackbarth,* supra. Appellant failed to do either. The ground of error is overruled.

Appellant contends that the trial court erred in denying a pretrial psychiatric examination and competency hearing when the issue was raised by written motion. Appellant's motion was titled *Motion for Court Appointed Psychiatrist* and requested such appointment but did not request a competency hearing. The court held a hearing on appellant's motion. No evidence was presented at the hearing in support of the unsworn motion. Appellant's attorney was not sworn and indicated that he need not produce evidence. "Your Honor, it's not necessary that I present a belief—that it's my belief that there is— that should be sufficient evidence in itself that this Defendant is incapable, is my own belief." An unsworn motion requesting a psychiatrist and an unsworn statement by appellant's attorney does not constitute "evidence" under Art. 46.02, Sec. 2(a) & Sec. 4(a), V.A.C.C.P. to support appellant's motion or otherwise raise the issue of com-

---

**8.** Art. 37.071(b)(3): If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

petency so as to require a hearing. See *Porter v. State*, 623 S.W.2d 374 (Tex.Cr. App.1981); *McWherter v. State*, 607 S.W.2d 531 (Tex.Cr.App.1980); *Stiehl v. State*, 585 S.W.2d 716 (Tex.Cr.App.1979).

Furthermore, the transcript contains an order, dated the day after the pretrial hearing and signed by the judge who heard appellant's motion, granting appellant's motion for a court appointed psychiatrist. The transcript also contains the psychiatrist's report finding appellant competent to stand trial. The ground of error is overruled.

■■■ Appellant claims that the trial court erroneously denied his third motion for continuance. At the pretrial hearing appellant based his motion "... on the fact that primarily we have a writ of habeas corpus pending before the Court of Criminal Appeals and to deny the opportunity to my Defendant to make bond where it might be allowed would be to deny him effective assistance of Counsel in this matter." Appellant does not say how or why this is so. No showing was made that counsel could not consult with appellant or was in any way hampered in adequately preparing for trial.

Appellant also argues that the motion should have been granted because his attorney had not had sufficient time to investigate, research and prepare the case. The record is to the contrary. The first of appellant's pretrial motions was filed on March 31, 1977. The third motion for continuance was filed June 21, 1977 and heard September 1, 1977. Voir dire began on September 6, 1977. Even if we assume the highly improbable situation that appellant's attorney was hired on March 31, 1977, the date of the first pretrial motions, counsel had almost six months to prepare for trial, including 2½ months after the third motion for continuance was filed in which to prepare for trial. See *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980); *Davis v. State*, 513 S.W.2d 928 (Tex.Cr.App.1974).

■■■ Finally, appellant claims error in the overruling of his motion for continu-ance because he claims that he was denied the right to trial by an impartial jury because a co-defendant had been tried less than two months before. Appellant does not attempt to demonstrate how this denied him an impartial jury, given that the voir dire afforded him an opportunity to examine veniremembers for any knowledge of the case and for bias. See *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980). The ground of error is overruled.

■■■ In two related grounds appellant claims error in the trial court's refusal to appoint an investigator or to give him the funds to retain one of his choice and in the refusal of the trial court to appoint an expert witness for appellant. Both motions allege that appellant is an indigent. Appellant cites Art. 26.05, V.A.C.C.P. as authority for the court's appointment of experts and payment of fees. Art. 26.05 provides that *court appointed attorneys* may be paid for certain expenses. Appellant's attorney was retained. No evidence of indigency was presented other than the appellant's unsupported allegations. Additionally, even an appellant represented by a court-appointed attorney who claims improper action under Art. 26.05 must show harm. *Reed v. State*, 644 S.W.2d 479 (Tex. Cr.App.1983). Appellant neither alleges nor shows that he incurred any investigative expenses and did, in fact, call the expert witness he had requested be appointed. The grounds of error are overruled.

■■■ Appellant contends that the indictment is fundamentally defective because it is unclear whether it charges that an individual acting alone or the group acting as a whole committed the offense. The indictment charged that appellant and three other named defendants "... did then and there intentionally cause the death of an individual, John C. Denson, by shooting him with a gun, and that the said defendants were then and there in the course of committing and attempting to commit burglary;"

V.T.C.A. Penal Code, Sec. 7.01(c) provides that "each party to an offense may be charged and convicted without alleging

that he acted as a principal or accomplice." Appellant's contention is without merit.

Appellant also argues that the indictment is fundamentally defective because it fails to negate the existence of any exception to the offense. V.T.C.A. Penal Code, Sec. 2.02 provides that negation is necessary only when the exception is labeled in the Penal Code. There are no exceptions to the offense charged in this case. This contention is without merit. See *Ex Parte Davis*, 542 S.W.2d 192 (Tex.Cr.App.1976).

Appellant claims that the trial court erred in refusing a hearing out of the presence of the jury concerning a pre-trial lineup involving appellant and his co-defendants. The record reveals that the questioning concerned Joey Starvaggi and not appellant. No issue of identification of appellant at a lineup was ever mentioned. As the State points out, the jury was never informed that appellant was ever in a lineup or had been identified. Also, appellant stated, "Well, my objection is if she had seen him in a lineup, did she identify him? If they're going into the identification, which is the next ultimate, I would prefer to have an identification hearing as to the validity of that lineup." The State did not go into the identification of appellant at any lineup so even by the terms of appellant's objection no hearing was required. The ground of error is overruled.

■ The district attorney and two assistant district attorneys represented the State during the voir dire. Appellant now complains that the district attorney "improperly entered himself into the trial after jury selection had begun...." Appellant does not explain how this was improper or how this harmed appellant. Appellant does not point to the place in the record where this alleged impropriety occurred and on examination of the record we find that no objection was made by appellant. Nothing is preserved for review in the absence of an objection. *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980).

■ Next appellant argues that photographs of the crime scene were erroneous-

ly introduced by the State solely to bolster earlier testimony. Appellant states that the photographs were taken after the scene was under investigation and were prejudicial to his case. It appears from the record that the photographs were not pictures of the crime scene but photos of the diver searching for and recovering, weapons taken in the burglary of the Denson's house. The pictures showed the weapons and the location on the San Jacinto River from which they were recovered.

■ If a verbal description of the item, be it a body, a weapon, or a location is admissible, a photograph depicting the same is also admissible. *Hall v. State*, 619 S.W.2d 156 (Tex.Cr.App.1980); *Luck v. State*, 588 S.W.2d 371 (Tex.Cr.App.1979). Only if the probative value of the photograph were very slight and the inflammatory aspects great would it be an abuse of discretion to admit the photograph. *Harrington v. State*, 547 S.W.2d 621 (Tex.Cr. App.1977). In this case the location where the weapons were discovered was mentioned in appellant's confession and in testimony by other witnesses. We do not see how these photographs prejudiced appellant, who had told of throwing the weapons in the river in his confession. Compare *Hall*, supra; *Luck*, supra; *Burks v. State*, 583 S.W.2d 389 (Tex.Cr.App.1979). The ground of error is overruled.

■ Appellant complains that the trial court erred in allowing the State to use "certain leading questions" when inquiring about the warnings given to appellant when he made his confession. Several witnesses testified for the State regarding the warnings. The transcription of the hearing on the admissibility of the confession contains over one hundred pages of testimony. Appellant does not show where in the record the alleged leading questions occurred, does not specify to which witness he refers, and does not state what questions he alleges to be leading. Appellant's contention does not comport with the requirements of Art. 40.09, Sec. 9, V.A.C.C.P. Nothing is presented for review. *Cook v. State*, 611 S.W.2d 83 (Tex.Cr.App.1981).

■ Appellant objected to the introduction of his confession, claiming that it was not voluntary because he had gone without sleep and without food from the time of arrest up to the time of the confession. The trial court held a hearing on the voluntariness of the confession and found that the confession was voluntary and complied with Art. 38.22, V.A.C.C.P.

At the hearing Texas Ranger Bobby Prince testified that he and several other officers arrested appellant at 4:00 a.m. and brought him before a magistrate. Prince testified that appellant was not mistreated or abused in any way. Appellant was advised of his rights by the magistrate and placed in jail. At about 1:30 that same afternoon Officers Wesley Styles, Billy Colson and Forrest Simpson arrived at the jail to question appellant. Appellant was advised of his rights before giving his statement and again before writing it down. All three officers testified that appellant appeared normal to them, spoke calmly and intelligently with them, did not seem tired, and did not fall asleep or yawn during the time he gave them his statement. The officers testified that no threats or promises were made toward appellant, that they asked him if he wanted anything to eat or drink, and that he drank some coffee.

Appellant's testimony contradicted much of what the State's witnesses said. Appellant claimed that he had not slept in two and one-half days, that he had been taking drugs, and that he was threatened that if he did not confess he would not live. Appellant also testified that he was handcuffed to the bars in the jail so that he was standing on his tiptoes, although he was still able to obtain and smoke a couple of cigarettes during this time.

■ Appellant argues that the State did not rebut his allegations of mistreatment and lack of sleep and food, thus failing to meet its burden of proof to show the voluntariness of the confession. *Farr v. State,* 519 S.W.2d 876 (Tex.Cr.App.1975). As we said in *Alonzo v. State,* 591 S.W.2d 842, 846 (Tex.Cr.App.1980), "Although the officers did not specifically rebut appellant's allegations of coercion in this case, their account of the taking of the confession is fundamentally inconsistent with appellant's version." At a hearing on the voluntariness of a confession the trial judge is the sole judge of the credibility of the witnesses. *Moon v. State,* 607 S.W.2d 569 (Tex.Cr. App.1980); *Myre v. State,* 545 S.W.2d 820 (Tex.Cr.App.1977). In this case the officers' testimony specifically rebuts most of appellant's allegations, and implicitly rebuts the rest, as in *Alonzo,* because their account is fundamentally inconsistent with appellant's version. The trial court found that appellant made his confession freely and voluntarily and that his constitutional rights were not violated. The facts revealed in the record support this finding. The ground of error is overruled.

■ Officer Wesley Styles testified that when he investigated the scene of the murder he noticed automobile tire tracks in the Denson's garage on the side of the garage where the Denson's had not parked their car. He also saw maroon paint on the facing of the garage door where a car had hit the door. Styles submitted the piece of facing with the paint on it to the laboratory. After further investigation Styles went to the home of Mary Bevins, appellant's sister, where he located a maroon car which was damaged on the right front door and the quarter panel. Styles testified that Mary Bevins consented to his request to take a paint sample from the outside of the car, which was parked on the street near her house, and that she indicated that she had the right to give permission. Mary Bevins told Styles the car was owned by her brother Buddy Green and that he was living with her at the time.

Mary Bevins testified that she did not give Styles permission to take a paint sample from the car and that she had no authority to do so since it was her brother's car.

Appellant contends that the taking of the paint samples constitutes a search and that Styles should have had a warrant to obtain the samples.

Appellant does not have standing to contest the search of his brother's car. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The ground of error is overruled.

During the trial the state attempted to show that appellant was the intruder who had said "Kill them. Kill them. Aren't you going to kill them?" Since neither Grace nor Susan Denson had seen appellant the State attempted to identify appellant as the person who had made the above-mentioned statement by virtue of a speech impediment or lisp. Grace Denson testified that the man who had said the above-mentioned statement spoke with a speech impediment or lisp.

After the defense had rested the State called three witnesses in rebuttal to testify that appellant spoke with a lisp. These witnesses were the court reporter, a Justice of the Peace, and a woman who had been in the courtroom and had heard appellant speak. Appellant objected to only one of the three, claiming that she had been in the courtroom during the entire proceedings when "the Rule"[9] had been invoked.

Appellant now contends that the State should not have been allowed to use witnesses to identify appellant by an alleged speech defect. We will address only that ground which was preserved at trial. *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr. App.1980); *Carrillo v. State*, 591 S.W.2d 876 (Tex.Cr.App.1979).

The prosecutor stated that it was only the preceding day when appellant's sole witness at the guilt-innocence stage testified that appellant had never had a speech impediment that it came to his attention that these people would be called as witnesses.

The record contains appellant's counsel's allegation that one of the witnesses, Peggy Stevens, had been in the courtroom during the entire proceedings. She testified that she heard appellant speak and that he spoke with some sort of a speech impediment. She also said that she was busy doing other things at the time appellant was speaking so that she heard him speak but "wasn't hanging on every word." Stevens was never asked if she had heard the testimony of appellant's sister in which she stated that appellant did not have a speech impediment.

Enforcement of "the rule" is within the discretion of the trial court. *Cooper v. State*, 578 S.W.2d 401 (Tex.Cr. App.1979). The court's decision will not be reversed unless an abuse of discretion is shown. *Brown v. State*, 523 S.W.2d 238 (Tex.Cr.App.1975). Violations of "the rule" fall into two main categories: witnesses who have been sworn or listed as witnesses in the case and either hear testimony or discuss another's testimony; and persons like Stevens, who were not intended to be witnesses and are not connected with the case in chief but who have, due to events during trial, become necessary witnesses. Stevens was apparently not connected with the case in any way and simply heard appellant speak. No abuse of discretion is shown. The ground of error is overruled. Appellant contends that the trial court erroneously overruled his objection to the State's efforts to impeach its own witness. Albert Pritchett testified that he had lent his revolver to appellant. The State later elicited from him that he was subpoenaed to appear and was not voluntarily testifying. Appellant's counsel said: "Objection. That calls for a conclusion on his part." This is not in any way an objection aimed at impeachment. The specific objection raised on appeal will not be considered if it varies from the specific objection made at trial. *Hodge v. State*, 631 S.W.2d 754 (Tex.Cr.App.1982); *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr.App.1981). Nothing is presented for review. Appellant next contends that the State improperly withheld a co-defendant's confession from discovery by appellant, claiming the confession might have been used by appellant to exculpate himself.

9. Art. 36.03, V.A.C.C.P.

The excluded confession was never made part of the record of this case. The record was not supplemented to include the confession. Nothing is presented for review.

Appellant argues that when he was advised of his rights he should have been warned that anything he said could be used against him to obtain the death penalty. Appellant was advised of his rights in compliance with *Miranda v. Arizona,* and with Art. 38.22, V.A.C.C.P. He was warned by a magistrate and warned by the officers twice during the taking of his confession. He was also told that he was under arrest for capital murder. We see no reason for further warning him that he could receive the death penalty. Appellant's rights were fully protected by the warnings he received. The ground of error is without merit.

Appellant contends that part of the prosecutor's jury argument was an indirect reminder to the jury that appellant did not testify:

I would like to remind you that this charge on the last page that the Judge signed, tells you your first job is to go back in and elect a foreman and I'll ask you to—you all know each other somewhat now—and I'll ask you to select a member that you respect and you are willing to follow because it is his job to preside with you while you are back there. And it's his job to keep you on the right track.

In other words, if somebody gets off on some issue that is not germain (sic) or some other issue, it is his job to get you back on the track. For example, if you go to talking about something that you shouldn't, it's his job to say we are not supposed to discuss that. For example, don't discuss the defendant's failure to testify. Don't comment on it. If someone does that, I will ask the foreman, "Say, hey, just a minute. We can't discuss that."

Appellant did not object at any time to this argument. Unless the arguments of the prosecutor are so prejudicial

that no instruction could cure the harm, the failure to timely object waives any error. *Plunkett v. State,* 580 S.W.2d 815 (Tex.Cr. App. opinion on rehearing 1979). It is doubtful that this argument is error in any case. See *Carrillo v. State,* 566 S.W.2d 902 (Tex.Cr.App.1978); *Short v. State,* 511 S.W.2d 288 (Tex.Cr.App.1974).

Appellant further contends that the another part of the prosecutor's argument to the jury was improper. The prosecutor was discussing some discrepancies in Susan Denson's testimony concerning whether she saw her father's feet extending from the kitchen as she and her mother left the house to run to the neighbor's:

I think Susan saw the feet. I don't know exactly where she was when she saw it, she might come forward for a way before the officer turned him back over in the dining room or family room and get an angle and see the feet. I don't think she had known about the bare feet lying there if she hadn't seen it.

Appellant objected to the prosecutor "stating what he thinks as to testifying in this matter." The trial court overruled the objection.

During trial appellant sought to show that Susan Denson could not have seen her father's feet because his body was not sticking out into the hallway. The prosecutor's argument was a restatement of Susan's testimony and a resonable deduction from the evidence. See *Ramos v. State,* 419 S.W.2d 359 (Tex.Cr.App.1967). Appellant's ground of error is overruled.

As best we understand appellant's next assertion, he contends that the trial court erred in not including his requested charges concerning lesser included offenses and the voluntariness of the confession. Appellant argues that the jury should have been charged on the lesser included offenses of murder and voluntary manslaughter as requested at trial. The trial court included a charge on murder. There was no evidence of sudden passion presented, thus the evidence did not raise voluntary manslaughter. *Hobson v. State,*

644 S.W.2d 473 (Tex.Cr.App.1983); *Bravo v. State*, 627 S.W.2d 152 (Tex.Cr.App.1982). No error is presented.

 Appellant also contends that the trial court should have included a charge on the voluntariness of the confession and on whether appellant made a knowing and intelligent waiver of his rights. The trial court charged the jury that they must acquit appellant if they found that appellant was not properly warned or that "the statement was made in response to improper influence of any officer such that it was not voluntary." [10] Appellant did not offer any evidence contradicting the State's testimony about the voluntariness of the confession. No evidence was presented before the jury to raise an issue as to voluntariness or as to the knowing and intelligent waiver of his rights. Appellant was not entitled to any instruction on voluntariness, although the court did charge the jury, as noted. See *Jernigan v. State*, 661 S.W.2d 936 (Tex.Cr.App.1983); *Brooks v. State*, 567 S.W.2d 2 (Tex.Cr.App.1978). The court's charge was ample in that regard. *Hughes v. State*, 562 S.W.2d 857 (Tex.Cr. App.1978). No error is shown.

 Appellant contends that the trial court erred in overruling his motion for new trial in which he alleged that the jury panel had not been properly selected at random. Appellant offered the original jury list into evidence, contending that it demonstrated that in numerous places on the list contiguous names were in alphabetical order and therefore there was not a random selection of jurors.

The list contains 331 names which come from all "parts" of the alphabet. Appellant offered no evidence as to how the jurors were selected or listed. Without some evidence we cannot possibly determine whether the list is a random selection, but no pattern is apparent to us. The ground of error is overruled.

 Appellant contends that the State improperly asked appellant's character witnesses if they knew whether appellant had been involved in plot to murder a sheriff and that the State never offered any evidence of such plot. First, we note that the State asked appellant's witnesses "Have you heard" questions, not "if they knew" as appellant alleges. The form of the question was proper. *Brown v. State*, 477 S.W.2d 617 (Tex.Cr.App.1972).

The prosecutor asked two of appellant's character witnesses if they had heard anything about appellant being involved in a plot to kill a sheriff. He also asked three other character witnesses if they had heard anything about appellant being involved in a plot to kill anybody. Appellant objected only to one of these "have you heard" questions. Nothing is presented for review in the absence of an objection. *Barecky v. State*, 639 S.W.2d 943 (Tex.Cr.App.1982); *Henderson v. State*, 617 S.W.2d 697 (Tex. Cr.App.1981). Appellant's one objection was properly overruled since a proper "have you heard" question must involve an act that is inconsistent with the character trait about which the witness has testified, and this question did so. *Brown*, supra. The character witness testified about appellant's general reputation and was questioned as to whether he knew of any previous criminal acts of any type in which appellant had been involved. The question was proper.

Furthermore, appellant contends on appeal that the State never offered any proof of a plot to kill the sheriff. His objection at trial simply was that the question "has nothing to do with this [case]." A specific objection raised on appeal will not be considered if it varies from the specific objection made at trial. *Carillo v. State*, 591 S.W.2d 876 (Tex.Cr.App.1979). The ground of error is overruled.

Appellant alleges that error resulted from the refusal of the second trial judge, Judge Lee Alworth, to disqualify himself.

---

**10.** Apparently the court considered the evidence of guilt insufficient without appellant's confes- sion.

Appellant filed a motion for disqualification of Judge Ernest Coker, Sr. on May 20, 1977. The motion was overruled, but Judge Alworth subsequently became the trial judge. Appellant's motion was directed specifically at Judge Coker and not Judge Alworth. Appellant's brief alleges that a motion was filed by appellant requesting that this second trial judge disqualify himself. This allegation is without support in the record in this case; the ground of error is without merit.

The judgment is affirmed.

ONION, P.J., and MILLER, J., concur.

CLINTON, Judge, concurring in part and dissenting in part.

The majority's conclusion that the evidence is sufficient on both special issues 1 and 2 is based on two assumptions: (1) that it was appellant who said "shoot him, shoot him" during his struggle with the victim, immediately before Starvaggi fired the first bullet into Denson which struck him in the shoulder; and, (2) that it was appellant who, speaking with a "speech impediment," urged the triggerman to "kill them, kill them" while standing at the feet of the victim's wife and daughter, after Starvaggi had fired the two fatal shots into Denson's heart.

If it were proved beyond a reasonable doubt that appellant was, in each instance, the person speaking, then I could agree that "appellant's conduct was quite similar" to that of Earnest Benjamin Smith; [1] that appellant "told Starvaggi to shoot Denson;" that appellant "also encouraged Starvaggi to kill Susan and Grace Denson;" that "he participated directly in the shooting of the victim [2] and, after that deed had been done, urged his cohorts to kill the victim's wife and daughter."

As the majority correctly observes, in order to prove appellant was the person uttering either of the phrases in question, it was incumbent upon the State to exclude reasonable inferences *other than* that it was appellant. This, the State was unable to do.

The record reflects that Susan and Grace Denson each positively identified Starvaggi's voice in a pretrial voice identification procedure. They were, however, unable to identify appellant's voice—even when he spoke the phrases in issue. At trial, the State *did not ask* Susan Denson whether the "shoot him, shoot him" voice sounded like that of Starvaggi or not. Since appellant and Starvaggi were the only intruders in the house at that point, and Susan had been able to discern Starvaggi's voice, testimony by Susan that the voice did *not* sound like Starvaggi's, would have excluded every reasonable inference other than that it was appellant. But the question was not asked.

Is it any less or more reasonable to infer that it was Starvaggi—observing at the bottom of the stairs that appellant had his pistol [3] as he struggled with Denson—than appellant, who urged the other to "shoot him, shoot him?" Each inference is equally likely under the evidence, and neither was excluded.

Only Grace Denson testified that someone stood at her and Susan's feet and urged Starvaggi to "kill them, kill them." Susan Denson was asked:

"Q: Was there any discussion—did you hear any discussion about shooting you and your mother?

A: No, sir.

Q: Did anybody say anything that you all should be shot?

A: Not that I know of."

---

1. See *Smith v. State,* 540 S.W.2d 693 (Tex.Cr. App.1976).

2. Albeit not the ultimate *fatal* shooting which the evidence clearly shows was done by Starvaggi alone at a time when no one but he and Denson were in the kitchen.

3. The evidence established the gun appellant carried was inoperative, and indicates appellant may have known of its condition at the time of the offense.

Since Grace Denson's testimony was the only evidence that the "kill them, kill them" phrase had been spoken, the identification of appellant as the speaker also depended entirely on her. Thus, apparently anticipating testimony to be adduced at the punishment phase to the effect that appellant spoke with a lisp, the prosecution, during the State's case in chief on guilt, sought to establish that the person who uttered the phrase spoke, not only with a speech impediment, but a particular kind. That effort was as follows:

"Q [By prosecutor]: I'll ask you if you noticed anything unusual about the voice....

A: Yes, he had a speech impediment.

\* \* \* \* \* \*

Q: And by speech impediment, could you tell the jury and the Court, more or less, what you have reference to?

A: Well, he kind of have [sic] a lisp-like. \* \* \* He didn't speak very plainly."

Labeling it a "lisp-like," the witness only described the speech impediment in question as a failure to "speak very plainly." Thus, on crossexamination, the attributes of the "speech impediment" in question were pursued as follows:

"Q [By defense attorney]: How could you tell there was a speech impediment?

A: *Because he didn't speak very plainly.*

Q: *Did you hear a specific pronouncing as a lisp usually is?*

A: Well, yes. And he just had a kind of—just couldn't speak very plainly.

Q: Well, there weren't any lisp in kill them, kill them, aren't you going to kill them?

A: Yes.

\* \* \* \* \* \*

Q: —did you hear this person say anything else that might—

A: No, just kill them, kill them.

Q: At one point—and you determined there was a speech impediment from this one point?

A: Each time he said the same thing.

\* \* \* \* \* \*

Q: You didn't see this man, did you?

A: No, I didn't.

Q: So you don't know his size or anything else about him?

A: He seemed to have a speech impediment.

Q: That's right. You are not sure what kind of speech impediment, are you?

A: It was—he just couldn't speak plainly or clearly. *He had a lisp.*

Q: Was it necessarily a lisp or was it some other problem of just not speaking clearly?

A: He couldn't speak clearly, *and he had a lisp. I can't tell you exactly how.* I can't speak that way. *I don't know how.*

Q: But you could determine he had a lisp from that particular phrase?

A: *Yes.*"

The only other evidence adduced regarding a "speech impediment" was given at the punishment phase: State's witnesses testified appellant spoke with a "lisp;" defense witnesses testified he did not; and also made an issue was whether Martin or Bayer—the other two intruders in the house at the time the phrase was spoken—spoke with a "speech impediment."

From this contested evidence, the jury could have found beyond a reasonable doubt that appellant speaks with a "lisp."

However, Grace Denson's testimony fails to establish beyond a reasonable doubt that the *speaker* of the phrase spoke with a "lisp:" there is no opportunity for a "lisp" —a pronunciation of the sibilants "s" and "z" imperfectly, especially by giving them the sound of "th"—in the words "Kill them. Kill them. Aren't you going to kill them." Moreover, using only the label "lisp," Grace Denson was unable to *describe* qualities of a "lisp" in the abstract; neither could she describe the particular attributes of the "speech impediment" she heard such that one might reasonably infer it was a "lisp."

In sum, Grace Denson's testimony at most established the person who urged Starvaggi to kill her and her daughter "just couldn't speak plainly or clearly." The State adduced no evidence which would exclude the reasonable hypotheses that one of the other two robbers, Bayer or Martin, spoke with the "speech impediment" Denson described only as unplain speech. Restated, it is no less plausible to infer that Bayer or Martin spoke the phrase in question, than it is to infer the speaker was appellant. This leaves a reasonable doubt that it was appellant who urged the women be killed.

I would hold that, upon viewing the evidence in a light most favorable to the prosecution, no rational trier of fact could find beyond a reasonable doubt, that appellant's conduct which made him a party to the capital murder of John Denson, was committed deliberately to cause the death of the deceased and with the reasonable expectation that his death would result.

Neither can I agree with the majority that the individual circumstances of appellant's participation in the offense established are alone sufficient to sustain the jury's affirmative answer to Special Issue No. 2. One need only review the facts constituting the offenses committed in cases such as *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977);[4] and *King v. State*, 631 S.W.2d 486 (Tex.Cr.App.1982), to ap-

preciate "the shocking nature of [those defendants'] crime[s] or the most dangerous aberration of character [they] evince." 631 S.W.2d at 504.

If this appellant's participation in the instant offense alone establishes beyond a reasonable doubt that there is a probability he will commit future acts of violence which constitute a continuing threat to society, then the substantive value of submitting Special Issue No. 2 to the jury has been obliterated.

Appellant was not the shooter. There is no evidence he helped plan the burglary transaction. There is no evidence *any* of the perpetrators expected a murder to be committed.[5] The State was unable to bring the jury evidence that appellant had ever before been convicted of a felony. Neither did the State adduce any evidence of past violent conduct on appellant's part.[6] The State did offer testimony from a Houston Police Department detective and the Cherokee County Sheriff to the effect that appellant's reputation for being a peaceable and lawabiding person was bad.

On the other hand, appellant, a cement mason by trade, introduced the testimony of four work associates: Donald Ford, the Training Director of the Cement Mason's Local Union; Travis Smith, the Business Manager of Houston Cement Masons; Howard Brown, owner of Howard Brown Construction Company; and, Gene Smith, a

4. *Relief granted on other grounds sub nom, Burns v. Estelle*, 592 F.2d 1297 (CA5 1979) *rehearing en banc*, 598 F.2d 1016 (CA5 1979), *order granting relief aff'd.*, 626 F.2d 396 (CA5 1980).

5. In fact the only inference from the evidence is that a murder was *not* planned from the outset: As the majority observes, the shooter, Joey Starvaggi, told Susan Denson,

"I killed your old man, you know. I didn't want to do it, but he made me. You had a good old man, you know."

6. The only encounter with the law the State was able to produce was that in March of 1976, a Houston police officer stopped a woman driving a Volkswagen. The officer testified he found a pistol, but did not elaborate. Appellant was a passenger in the car and was arrested for the misdemeanor offense, unlawfully carrying a pis-

tol. The record indicates he was fined $150.00 and sentenced to three days in jail.

In *Thompson v. State*, 659 S.W.2d 649, 654–655 (Tex.Cr.App.1983) the Court observed:

"We are unwilling to say that carrying a weapon is *per se* a 'violent' or 'aggressive' act of and by itself. See *Johnson v. State*, 650 S.W.2d 414 (Tex.Cr.App.1983). * * * [U]nlike the situation in which the State establishes the fact of a defendant's admissible prior conviction, [the offering party] here was free to develop the details of the ... conduct which gave rise to each of the convictions, and if it could be shown any or all of them involved acts of aggression, such evidence would have been appropriate for the jury's consideration.... But no showing of the underlying circumstances was made here. Accordingly, [there was a failure] to establish the prior convictions involved acts of violence...."

cement mason. Each of these witnesses testified that he had known and worked with appellant between ten and thirteen years, had never heard of his being in trouble with the law, and opined that he was a steady, reliable and talented cement mason. Brown and Smith each testified that notwithstanding appellant's conviction for capital murder, he would hire appellant if he were released.[7] Appellant also introduced the testimony of Ray Gilbert, an Assembly of God minister, who related that appellant—who Gilbert had known for thirteen years—had once poured a slab for a church building project, but refused payment for the work when it was offered. Gilbert also testified that appellant was "loved by" children, because he always took the time to give them his attention.

Next, appellant called James Keeshan, the District Attorney of Montgomery County, who testified that both Susan and Grace Denson had made positive voice identifications of Starvaggi as the person who had said "I killed your old man, you know...," but that no such identification had been made when the witnesses heard the lineup participants, including appellant, say, "Kill them. Kill them." Keeshan testified that two of the lineup participants had been singled out by the Densons as "possibly" the person who spoke the words, but he could "not remember" whether appellant had been one. Appellant also called Texas Ranger Wesley Styles who likewise testified that he did "not remember" whether appellant was one of the lineup participants who was identified as being "possibly" the speaker of the phrase "Kill them. Kill them...."

Finally, appellant called Ron Van Loon, a handwriting expert, who had conducted an analysis of appellant's handwriting which was contained in his written inculpatory statement. Van Loon characterized appellant as being "near genius" and a person who exhibited "a great deal of optimism," and had been "struggling for improvement all his life." According to Van Loon, appellant "has the capacity of being greater than most people in this room, including myself." It was Van Loon's opinion that appellant "would not deliberately go and take someone's life" and that with better direction, appellant could be a great asset to his community and society. Van Loon further opined that appellant is not likely "to hang around with a gun in his hand a lot of the time ... because he works more with his mind." The witness stated on crossexamination that appellant would not go "to another county and crash into a house, ... and terrorize the occupants and rob [them] alone, ... but he would be a follower."

To say, as does the majority, that the mitigating factors reflected by this record do not outweigh the aggravating factors, and that the evidence is sufficient to support the affirmative finding on the second special issue, is nothing short of fantastic. I cannot agree that the Legislature intended our special issue submission scheme to have so little effect on the determination of whether a person should live or die.

I am both gratified and relieved that the Court has seen fit to overrule *Wilder and Armour v. State*, 583 S.W.2d 349 (Tex.Cr. App.1979) and to adopt the analysis of the concurring opinion in *Meanes v. State*, 668 S.W.2d 366 (Tex.Cr.App.1983). I also agree with the majority that the conviction of appellant—at least as reflected by the record before us—is error free. Accordingly, I concur in the affirmance of appellant's conviction for capital murder.

7. According to Howard Brown, appellant had worked as a foreman for his construction company on several jobs. Additionally, Brown had assisted appellant in coaching a baseball team composed of seventeen and eighteen year old boys, and testified that "they all thought a lot of him." When asked what he would say appellant's reputation is, Brown replied:

"Well G.W. Green is—I think one of the finest men that ever worked for me on a job. He's never given me any trouble of any kind and as far as I know this is the first trouble that G.W. Green has ever been in..."

Gene Smith testified that he had on numerous occasions, in the capacity of foreman, hired appellant as a cement mason, and would hire him "today" if he were available.

But for the reasons stated, I would vacate the death sentence and reform it to life confinement.

ODOM and TEAGUE, JJ., join.