C. Neil JOHNSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–86–00392–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

July 23, 1987.

John Carlisle and Henry L. Burkholder, III, Houston, for appellant.

John B. Holmes, Jr., Harris Co. Dist. Atty., and Roe Morris and David Brothers, Harris Co. Asst. Dist. Attys., Houston, for appellee.

Before JACK SMITH, SAM BASS and DUNN, JJ.

## OPINION

DUNN, Justice.

A jury convicted the appellant of theft, and the court, after conducting a presentence investigation, sentenced the appellant to 10 years confinement.

The appellant was indicted for theft under Tex.Penal Code Ann. sec. 31.03 (Vernon 1974), and pursuant to Tex.Penal Code Ann. sec. 31.09, the indictment alleged a single scheme or continuing course of conduct involving 54 separate incidents.

The appellant met Bill Everett, who resides in North Dakota, in 1977 or 1978. The appellant approached Everett about putting together an exploration company in Houston funded initially by Everett and run by the appellant. As a result, the complainant, J & E Petroleum, Inc. ("J & E") was formed in February 1979. Everett was designated chairman of the board, and he committed $150,000 for start-up expenses, while the appellant was designated president with responsibility to run the company. Each owned half the shares, although additional shares were later given in small amounts to employees. The appellant contacted David Stallard, an attorney, who recommended that a 50–50 corporation be formed, and drew up the necessary legal documents. It was agreed that the appellant would earn $50,000 per year.

The appellant never received a regular salary on a normal payroll. Instead, he directed that money be taken out of the corporate account and transferred to his personal account in the form of checks, transfers, and advancements. However, compensation to the appellant was carried on the books as "loans" to the appellant, so as to be considered assets or accounts receivable of the corporation. While the "description statements" attached to each check state that the amounts were loans to the appellant, there is nothing in the record to indicate if or when the appellant was required to repay these loans, or the rate of interest applicable to the loans.

In 1980, the appellant started looking for a horse ranch as an investment. During 1980, Everett made numerous trips to Houston, and was aware of what was going on at J & E. In October 1980, Carolyn Phillips, who kept the appellant's personal checkbook, was hired, and Patty May was also hired to handle accounting. At this time, the appellant went to Europe to solicit investors for a large undertaking called the Clay County Project. The appellant also began transferring and receiving money from the corporation in 1980 to go into horse investments.

On January 1, 1981, Stallard came to work for J & E full-time as chief financial officer and in-house attorney. Stallard did all the legal, accounting, and tax work, and maintained the corporation's checking account. Stallard identified State's Exhibit #1, which was a binder containing all the checks that were drawn on the account of J & E and payable to the appellant during the period alleged in the indictment. Stallard continued the method that had been established prior to his arrival of transferring money out of J & E's account to the appellant's as directed by the appellant.

Beginning in May 1981, Stallard began to notice problems arising from increasing amounts of money being transferred from J & E to the appellant. It was at this time that the appellant sought the aid of Dewey Stringer, President of Texas International Oil in Houston, who had previously loaned the appellant $25,000 when J & E first started. This time the appellant received $100,000 from Stringer. He also got $100,000 more from Everett in May 1981. The appellant bought horses on May 29, 1981, June 6, 1981, October 27, 1981, January 21, 1982 (two), and February 3, 1982. All of these horses were associated with the appellant's horse ranch.

Sometime in the summer of 1981, Stallard talked to the appellant because the appellant was drawing money, which the corporation needed for operations, from the corporation and depositing it into his personal account. He had previously talked to the appellant when the amounts had started getting larger, and had suggested that

for income tax purposes they should set up a regular salary for the appellant. Meanwhile, Everett was not coming to Houston as much; however, in June 1981, Everett began questioning what was going on because he was not receiving any reports from J & E. Everett hired Loren Kopseng as a trouble-shooter, and sent him to Houston in June to establish better communications, and to get regular reports coming. The appellant talked briefly to Kopseng, and took him out to dinner promising to meet further the next day, but the appellant did not appear. Further attempts were made to meet with the appellant in September, October, November, and December 1981, but the appellant continued to be unavailable. The appellant also instructed Stallard to be uncooperative in giving Kopseng information, and on one occasion, the appellant refused to allow Kopseng to see the corporation's books. At a meeting between Stallard and Everett in December of 1981, Everett was allowed to see a financial statement, dated the end of October, that showed approximately $180,000 "loaned" to the appellant, explained to be in lieu of salary.

In August 1981, Mac McBryde located a piece of property for the appellant known as Split Creek Horse Ranch ("the Ranch"). The actual sale of the property took place in November 1981. Although a check was issued by J & E for $73,158.24, as the down payment amount, it was designated only as a check made payable to the bank from which a cashier's check was issued to pay the sellers. The total purchase price for the 320 acre ranch in Bell County was $257,784. Although there were a few checks drawn on J & E for expenses for the Ranch, Stallard did not notice them, and only became aware of the appellant's acquisition of the Ranch in December 1981.

Patty May had left J & E by the end of October 1981, but was rehired in December 1981, to handle the files for the Ranch and to develop an advertising program for it. The appellant set her up in an unused office adjacent to the land and computer offices of J & E. Her salary was paid from the appellant's personal account. Also in December 1981, the appellant retained a

C.P.A. firm with offices in Temple, Texas, to provide accounting services for the Ranch.

Meanwhile, J & E was acting as operator of the Clay County Project during the latter part of 1981. Four partners had joined the venture, and several hundred thousand dollars were contributed to J & E for paying the various contractors. The money from the partners went into the general account from which Stallard would make disbursements to cover expenses.

Beginning in January 1982, the appellant began taking extraordinary amounts of money out of J & E. Once Stallard was told about the Ranch, he began a series of talks with the appellant wherein he stated his concern that the appellant was spending so much time and money on the Ranch that it was jeopardizing J & E. The appellant told Stallard not to worry, that he had everything under control. In January, the appellant transferred $161,000 to his account as the money from the contributors in the Clay County Project provided a substantial amount of cash. Stallard again talked to the appellant, pointing out that the large transfers were jeopardizing both J & E and the entire Clay County Project. In February 1982, the appellant transferred $50,000 to his own account. In March, the appellant transferred $338,000 to his account. Once again, Stallard questioned the appellant, who assured him that he could back up the transfers if the corporation needed it by selling some of his personal production.

In February 1982, the appellant received a letter from Charles Schreiner following the appellant's visit to Schreiner's ranch. The letter indicates Schreiner's awareness that the appellant had bought a horse ranch in his area. The appellant responded in a letter that he hoped he could emulate the fine qualities Schreiner's family had established, and could leave to his son, for his care and enjoyment, the benefits of owning and using land to its fullest.

By April 1982, there was no more money in J & E's account, and creditors from the Clay County Project were demanding payment, and liens were being executed on the property and rigs. Stallard finally realized that the appellant had reached a point of possible criminal violations, so he contacted Everett. At about the same time, Stringer heard that the appellant was taking money from the corporation, and asked the appellant to come over and explain the situation on April 13, 1982. The appellant told Stringer that he had purchased a ranch personally, and had taken money from the corporation to pay for it. The appellant admitted that he had used some of the line of credit which some of the investors had given, along with other money that was advanced by various partners.

The next day, the appellant called North Dakota, and for the first time told Everett and Kopseng about the ranch. The appellant flew up the next day, and admitted to Everett and Kopseng that he had made a mistake and taken company money to buy the Ranch. The appellant claimed that he had counted on J & E having more deals to cover the transfers, but that the deals did not come through. The appellant asked Everett to contribute another $300,000 to J & E, but Everett declined. The following Monday, Kopseng went to Houston and met with the appellant and Stringer on Tuesday, where a discussion was held about possible emergency measures that might be taken to satisfy creditors and keep J & E solvent.

On April 20, 1982, a combination shareholders' and directors' meeting was held at which Kopseng represented Everett, and the appellant was present along with others. The appellant agreed to execute a quit-claim deed for the Ranch, the horses, and other property (all of which were in his name) to J & E. The appellant was stripped of all of his powers in the corporation. The appellant was allowed an offset of salaries of $50,000 for 1979, $75,000 for 1980, and $100,000 for 1981. On April 22, 1982, Kopseng went to the Ranch with Stallard in order to take inventory of all the property.

At a subsequent meeting on April 27, 1982, Everett was present, and the appellant was accompanied by an attorney, who insisted on making a proposal to the di-

rectors of possible ways to resolve the financial woes of J & E. The appellant's proposals were rejected, and he was asked to resign, to do what he could to return the money, and to turn his stock over to the corporation. The appellant agreed to this after talking with his attorney.

At trial, the appellant submitted his own total of checks and transfers from J & E to the Ranch between the dates of April 9, 1981, and April 12, 1982 as $741,415.23. In addition, the appellant acknowledged that some amounts were not listed, including four checks totaling about $28,000. The appellant acknowledged that the total spent on the Ranch was $1,065,440.80. The appellant also acknowledged that the indictment alleges a total of $850,000 in checks from J & E to his personal account. While Stallard signed a majority of these checks, he was directed to do so by the appellant. The appellant's calculations showed that a total of $866,000 was transferred to the Ranch through the appellant's personal account. Everett never consented to the appellant taking money from J & E, even in the form of a loan, other than the appellant's designated salary. Indeed, his consent was never sought.

In points of error one, two, and three, the appellant argues that there is insufficient evidence to prove that the appellant intended to deprive the complainant of the property, and that the appellant appropriated the property without the effective consent of complainant, in light of the appellant's mistake of fact defense. This argument is without merit.

The relevant inquiry when reviewing the sufficiency of the evidence to support a criminal conviction is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979). The appellant's indictment states in part as follows:

> C. Neil Johnson, hereafter styled the defendant, heretofore on or about October 14, 1980, did then and there unlawfully appropriate by acquiring and otherwise exercising control over property, namely, money, owned by J & E Petroleum, Inc., hereafter styled the Complainant, of the value of over ten thousand dollars, with the *intent* to deprive the Complainant of the property, and *without the effective consent* of the Complainant.

(Emphasis added.) The indictment then alleges 54 specific instances of the appellant acquiring and exercising control over the complainant's property.

The appellant argues that the sole question is "whether or not [the appellant] possessed a culpable mental state necessary to sustain the conviction and whether or not he had the authority to consent for the corporation based upon his mistaken belief of his actual or implied authority." The trial court submitted to the jury a charge defining the defense a mistake of fact as follows:

> [I]t is a defense to this prosecution if the defendant, through mistake, formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense charged.

> Therefore, if you believe from the evidence that the Defendant, C. Neil Johnson, III, pursuant to one scheme or continuing course of conduct obtained property, namely money, from the company, J & E Petroleum, Inc., beginning on or about October 30, 1980, and continuing through on or about March 29, 1980, if he did, but did so in the mistaken belief that he obtained the money with the consent of J & E Petroleum, Inc., real or implied, then you will acquit the Defendant, C. Neil Johnson, III, and say by your verdict "Not Guilty" or if you have a reasonable doubt thereof, you will acquit the Defendant.

■ Tex.Penal Code Ann. § 8.02 (Vernon 1974), states that mistake of fact is a defense; therefore, a reasonable doubt on the issue requires that the appellant be acquitted. Tex.Penal Code Ann. § 2.03(d). Also, when determining the validity of a mistake of fact defense, the inquiry is into the mistaken belief of the appellant. The defense impliedly looks to the conduct of

others only to the extent that such conduct contributes to the actor's mistaken belief, and does not look at all to the belief or state of mind of any other person. *Montgomery v. State*, 588 S.W.2d 950 (Tex.Crim. App.1979); *Lasker v. State*, 573 S.W.2d 539 (Tex.Crim.App.1978).

■ Our initial inquiry is whether the State disproved the appellant's mistake of fact defense beyond a reasonable doubt. In his brief, the appellant argues that the appellant "had absolute authority to consent to the expenditures and the ability to invest all the corporate funds." The appellant cites us to no authority in the articles of incorporation for the proposition that the appellant was authorized to expend funds to purchase a ranch or horses. Moreover, the record does not demonstrate how the appellant could have reasonably believed that he could invest corporate funds for *private purposes.* The Ranch was purchased with corporate funds, but title was placed in the appellant's name, not J & E's. Similarly, the horses and other property associated with the Ranch were purchased with corporate funds, but title was placed in the appellant's name.

The appellant's strongest argument is that he reasonably believed that he had the authority to authorize corporate loans to himself in order to purchase the Ranch and associated property. However, this argument fails in light of the director's resolutions adopted in lieu of the annual meeting of directors required to be held on February 27, 1981. These resolutions, in part, specifically authorized the appellant to execute, on behalf of the corporation, a guaranty securing a four year, $15,000 installment loan to be used by Stallard as a partial payment toward his condominium. It is inconsistent, at best, for the appellant to argue that he reasonably believed that he, as president, was authorized to borrow money from the corporation, whereas, Stallard, as chief financial officer, needed a director's resolution in order for J & E to guarantee his condominium loan. Further, because the "loans" to the appellant covered a period from October 14, 1980, until March 29, 1982, the appellant and J & E

are governed by Texas Business Corporation Act, ch. 64, art. 2.02A(6), 1955 Tex. Gen.Laws 239, 242, *amended by*, Corporations—Powers, Duties, Indemnification, Assets, and Surplus Determination, ch. 540, sec. 1, 1983 Tex.Gen.Laws 3140, 3141.

This article stated that a corporation "shall have power ... [t]o lend money to, and otherwise assist, its employees, *but not to its officers and directors.*" *Id.* (emphasis added). The appellant could not have reasonably believed that he had express or implied authority to borrow corporate funds when the corporation did not have the power to loan him money.

The State met its burden of disproving, beyond a reasonable doubt, the appellant's mistake of fact defense.

■ Our second inquiry is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. The two essential elements in this case are that the appellant intended to deprive J & E of the money, and that he accomplished this without the effective consent of J & E.

■ With respect to the element of intent, the record reveals that the appellant specifically instructed Stallard, frequently over Stallard's objection, to sign the checks from J & E that were labeled "loans." These checks were deposited into the appellant's personal account, and the money was used to purchase the Ranch, horses, and other property in the appellant's name. Further, the appellant told Stringer that he had purchased the ranch personally, and in a letter to Schreiner, stated his desire to leave the Ranch to his son. This evidence is sufficient for a rational trier of fact to have found, beyond a reasonable doubt, that the appellant intended to deprive J & E of the money.

■ With respect to the lack of J & E's effective consent, there is no evidence in the record of a board of director's meeting authorizing the appellant's actions. Further, the appellant's behavior indicates that he knew J & E did not consent to his spending corporate money for the purchase of personal property. When Everett be-

came suspicious and sent Kopseng, his troubleshooter, to determine what was going on at J & E, the appellant avoided meeting with Kopseng, and instructed Stallard to also be uncooperative. This evidence is sufficient for a rational trier of fact to have found, beyond a reasonable doubt, that the appellant acted without the effective consent of J & E.

Points of error one, two, and three are overruled.

In point of error four, the appellant argues that the trial court erred in overruling the appellant's objection to the court's charge that included the implied means of appropriation, deception; thereby authorizing the appellant's conviction on a theory not alleged in the indictment. This argument is without merit.

■ Because the appellant objected to the charge, "reversal is required if the error is 'calculated to injure the rights of defendant,' which means no more than there must be *some* harm to the accused from the error." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (emphasis in original). The appellant relies on *Lang v. State*, 698 S.W.2d 223 (Tex.App.— Dallas 1980, no pet.), to demonstrate some harm to the appellant. This reliance is misplaced, because in *Lang*, unlike the case before us, the indictment alleged that the appropriation was "without effective consent *since no consent in fact was given by the owner.*" 698 S.W.2d at 224 (emphasis added). The jury charge authorized conviction if the State proved "that at the time of the appropriation, if any, the defendant appropriated the same by means of deception." *Id.*

■ In the case before us, the indictment alleges that the appellant acted "without the effective consent of the Complainant." Therefore, any of the statutory definitions of "effective consent" can be used in the jury charge. *See Thomas v. State*, 621 S.W.2d 158, 164 (Tex.Crim.App. 1980). Tex.Penal Code Ann. § 31.01(4)(A) states that consent is not effective if induced by deception or coercion; therefore, there was no error in the jury charge.

Point of error four is overruled.

■ In point of error five, the appellant argues that the trial court erred in overruling the appellant's objection to the court's charge, thereby authorizing the jury to convict the appellant if they found that he "acted pursuant to one scheme or continued course of conduct beginning on or about October 14, 1980, and continuing through on or about March 29, 1982," without setting out in the charge those specific dates on which the alleged theft occurred as set out in the indictment. The appellant argues that the court's charge, when combined with argument by the prosecutor that all the jury had to do was find that the appellant stole $10,000, and they could do that without even looking at the evidence, constitutes harmful error and a variance between the indictment and evidence. This argument is without merit.

The jury charge, in pertinent part, states as follows:

Therefore, if you find from the evidence beyond a reasonable doubt that the defendant, C. Neil Johnson, in Harris County, Texas, pursuant to one scheme or continuing course of conduct beginning on or about October 14, 1980 and continuing through on or about March 29, 1982, did then and there unlawfully appropriate by acquiring or otherwise exercising control over property, other than real property, namely, money, owned by the J & E Petroleum, Inc., *and the aggregate amount of the property so obtained was ten thousand dollars or more*, with intent to deprive the J & E Petroleum, Inc. of the property, without the effective consent of the J & E Petroleum, Inc., then you will find the defendant guilty as charged in the indictment. If you do not so believe or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict not guilty.

(Emphasis added.)

This Court recently addressed the issue of whether a jury could convict the appellant based upon a finding that the appellant committed some, but not all, of the acts charged in the indictment. *Lehman v. State*, 727 S.W.2d 656, 659 (Tex.App.—

Houston [1st Dist.] 1987, no pet.); *see also Wiley v. State*, 632 S.W.2d 746 (Tex.Crim. App.1982). In *Lehman*, we stated that

> the jury was authorized to convict the appellant only if the value of the money stolen was more than $750 and less than $20,000. This limitation precludes the possibility that the jury convicted the appellant of one or more thefts in which the total amount involved was less than $750.

727 S.W.2d at 659.

Similarly, in the case before us, the jury was authorized to convict the appellant only if they found that the "aggregate amount of the property so obtained was ten thousand dollars or more." There was no error in the court's charge.

■ With respect to the prosecutor's statement, because defense counsel did not object to the argument, any error was waived unless the statements were so prejudicial that no instruction could have cured the harm. *Green v. State*, 682 S.W.2d 271, 295 (Tex.Crim.App.1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985). The prosecutor's remarks were merely a summation of the overwhelming evidence which had been introduced against the appellant. *Todd v. State*, 598 S.W.2d 286, 296–97 (Tex.Crim. App.1980).

Point of error five is overruled.

The judgment of the trial court is affirmed.