**Joseph Paul JERNIGAN, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 68919.**

Court of Criminal Appeals of Texas, En Banc.

April 27, 1983.

Rehearing Denied June 22, 1983.

Certiorari Denied Nov. 14, 1983. See 104 S.Ct. 436.

Jimmy Morris and Jody Tullos, Corsicana, for appellant.

Patrick C. Batchelor, Dist. Atty., Corsicana, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

OPINION

W.C. DAVIS, Judge.

Appellant was convicted of capital murder. Upon the jury's findings that the killing was deliberate and that appellant represents a continuing threat to society, punishment was assessed at death. Art. 37.071, V.A.C.C.P.

Appellant now contends that his arrest and his subsequent confession, which was admitted into evidence, were tainted by the unlawful procurement of a warrant. The heart of his contention is that because appellant's wife was the named informant relied upon by the affiant in obtaining a warrant, and because a wife cannot testify against her husband, the affidavit was insufficient to support the issuance of the warrant.

Appellant relies upon this Court's decision in *Stribling v. State,* 86 Tex.Cr.R. 195, 215 S.W. 857 (Tex.Cr.App.1919), in which it was held that an information could not be supported by a complaint sworn to by the spouse of an accused. In that case, the court said: "a wife, being an incompetent witness against her husband, cannot be regarded as a credible witness within the statute. . . ."

Assuming the role of Stribling maintains its vitality,[1] appellant's reliance is nonetheless misplaced. Appellant confounds the nature of the affidavits provided for under Arts. 21.22 and Art. 15.05,[2] probably because each is called a "complaint".

Art. 15.05 and Art. 21.22 are derived from separate provisions of the previous codes, and have remained separate.[3] Further, their purposes are separate.[4]

The question presented by appellant's contention, then, is whether Art. 38.11, V.A.C.C.P. by its terms prohibits the use of information supplied by a person to obtain an arrest warrant naming that person's spouse. Art. 38.11 provides in pertinent part:

> "Neither husband nor wife shall, in any case, *testify* as to any communications made by one to the other while married. . . . The husband and wife may, in all criminal actions, be witnesses for each other, but . . . they shall in no case *testify* against each other in a criminal prosecution. . . ." [Emphasis supplied].

The language of Art. 38.11 speaks to *testimony in a criminal proceeding.* Here there was no testimony; indeed there was no criminal proceeding until after the warrant was procured. Nothing in Art. 38.11 prohibits the use of information supplied by a person other than as evidence in a criminal proceeding. A spouse as informant[5] does not violate Art. 38.11's strictures. The ground of error is overruled.

1. We note that "the statute", Art. 479 of the Tex.Code of Cr.Proc. (Vernon's, 1911), like its current successor, Art. 21.22, V.A.C.C.P., requires that an affidavit, to support information, must be sworn to by a credible *person,* not a credible *witness.* But see footnote 4, infra.

2. Art. 15.05, V.A.C.C.P. sets out the requisites of a "complaint" in support of a warrant of arrest.

3. Art. 15.05 derives from Art. 220 of the 1856 Code, then succeeded through slight modifications as Arts. 269 and 222 of the 1911 and 1925 Codes, respectively, Art. 21.22's lineage runs from Art. 404 of the Old Code through Arts. 479 and 415 of the codes of 1911 and 1925.

4. It may be appropriate, for example, to refuse to permit *incompetent* statements in an affidavit to supply the basis for an information, in that, no further document being needed to bring the accused to trial, no showing that competent evidence would be available at trial would open the door to prosecutorial abuse. A lack of evidence competent at trial should not and does not preclude the issuance of an arrest warrant, however. A warrant is procurable upon hearsay information where circumstances showing the credibility of the informant and the reliability of the information are shown, *Jones v. State,* 568 S.W.2d 847 (Tex.Cr.App. 1978), cert. den. 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 352 (1978). An arrest, while part of the accusatory process, may also be part of the investigatory process—as shown by the instant case. And, as here, mere arrest is insufficient to bring the accused to trial.

5. The distinction between informants and witnesses, and, a priori between information and testimony, was explicated, in a different context, in *Jones v. State,* 628 S.W.2d 51 (Tex.Cr. App.1981). In that case, the appellant was convicted of retaliation against a *witness,* see V.T.C.A. Penal Code, Sec. 36.06, but the proof showed only retaliation against an *informant,* which is also denounced by Sec. 36.06, but which was not alleged. Although that case was affected by the inclusion in Sec. 36.06(b) of a definition of "informant" for the purposes of that section, we think the same principles apply here.

Appellant next contends the court erred in overruling his motion to dismiss veniremember Nesmith for cause.

Upon voir dire examination of Nesmith by the State, the following exchange occurred:

"Q. Can you put aside everything that you have heard and read about this case and if you are selected as a juror, render your verdict solely on the evidence that comes to you from that witness stand?

"A. I think my—I might be biased in that opinion, come from—I knew the man pretty well.

"Q. Okay. Well, only you know.

"A. I might."

Questioned further, Nesmith stated that he could base his verdict only on the evidence presented, putting aside what he had heard or read about the case. The State's voir dire then continued:

"Q. You don't know this particular defendant, do you?

"A. No, sir.

"Q. You haven't established a conclusion as to his guilt or innocence at this time, have you now?

"A. No, sir.

"Q. Then, you feel like that you could listen to the evidence and base that verdict solely on that evidence and not because of anything you have heard?

"A. Yes, sir.

"Q. You are sure about that?

"A. (Juror nods.)

"Q. Can you wait until you hear all of the evidence before you decide he is guilty or innocent?

"A. Yes, sir."

Upon appellant's voir dire, it transpired that Nesmith had known the victim "all my life", and that for that reason "I could be—there is a possibility of [bias]." The following exchange then occurred:

"Q. Even the tiniest bit you could be?

"A. I could be, yes, sir.

"Q. That would be based upon knowing him and perhaps what you have heard about this case?

"A. Yes, sir.

"Q. Your Honor, we submit that because he has used the magic word, that he should be excused in this case.

"MR. BATCHELOR: Your Honor, he hasn't been shown to be excused for cause. Just because he says that he might be biased does not excuse him for cause. Now, he may be, but Mr. Morris needs—I don't think he's gone into that far enough.

"THE COURT: Do you have any further questions at this time?

"MR. MORRIS: I might, yes, sir.

"THE COURT: I'm going to deny your motion at this time.

"MR. MORRIS: All right.

"Q. (By Mr. Morris) I know you are going to be honest with us, Mr. Nesmith, and from knowing the man, can you honestly say from your heart, that you would be biased at least the tiniest bit of bias and prejudice in this case, if you served as a juror?

"Q. If I was chosen as a juror, no, sir. That's my duty to be a juror, but if I'm chosen as a juror, no, sir, I will not be biased. I will come in here with an open mind.

"Q. But at this moment, you do have such a feeling, don't you?

"A. Yes, sir, right now.

"Q. You have a small, at least a small amount of bias?

"A. Yes, sir.

"Q. Again, we submit, your Honor, that he is not qualified in this case, because of that feeling.

"THE COURT: Mr. Morris, I'm going to overrule your objection at this time."

The remainder of the appellant's voir dire centered around whether Nesmith could,

upon signing or participating in a verdict of not guilty, return to his community and "look people in the eye". Nesmith stated unequivocally that he could. No further examination was undertaken upon the issue of bias.[6]

Although a bias or prejudice *toward the accused* cannot be cured by a veniremember's statement that he can lay it aside, *Williams v. State,* 565 S.W.2d 63 (Tex.Cr.App.1978), no such bias *toward appellant* is shown here. The "bias" herein is closer to the facts shown in *Anderson v. State,* 633 S.W.2d 851 (Tex.Cr.App.1982), wherein this Court held that mere acquaintance with the victim and several State's witnesses did not amount to bias against the defendant. In the instant case, as in *Anderson,* the alleged bias was based upon the veniremember's relationship with the victim, and no bias was directed toward appellant.

Although it is apparent that Nesmith's friendship with the victim was closer than the acquaintanceships relied on in *Anderson,* the record reveals no more definitive statement of the nature and effect of that friendship than has been set out, supra. While it seems likely that the relationship might have affected Nesmith's ability to avoid bias against appellant in considering the questions on punishment once the jury had determined guilt, the voir dire was directed entirely to the issue of the determination of guilt or innocence. As the proponent of Nesmith's exclusion for cause under Art. 36.16, V.A.C.C.P., the burden of showing grounds for such exclusion rested upon appellant.[7]

Appellant has not met his burden of showing bias toward appellant, having shown only the use of the word without reference to appellant and an absolute denial that the bias was directed toward appellant himself. The ground of error is overruled.

Appellant next contends the court erred in excusing three veniremembers who expressed only general objections to the death penalty, in violation of the rule of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

Veniremember Pickett stated that his longstanding opposition to the death penalty would require him to vote against that penalty in every case, regardless of the facts. Upon being informed of the determinations of fact to be made by jurors during the punishment phase of capital murder trials upon a prior finding of guilty, Pickett stated he would answer one question "no" in every case in order to prevent a sentence of death; he further stated that his commitment to vote "no" was irrevocable.

Upon appellant's attempt to rehabilitate, Pickett reiterated his adamance until he was informed by appellant's counsel that to vote "no" where the facts required a "yes" answer, would be a violation of his juror's oath. Upon inquiry whether he could, under these circumstances, "follow the judge's instructions on what the law is regardless of whether or not you agreed with the law or not", Pickett allowed that, although he might not agree, he "might" follow out of duty. Pickett then began to continue his answer; but after uttering only the word "but", he was interrupted by a question asking whether he could assess the death penalty in case of a poisoning of a child to

6. At the close of the voir dire of Nesmith, appellant renewed his motion to excuse and, upon receiving an unfavorable ruling, exercised a peremptory challenge. A request for an additional peremptory challenge was made and denied upon the seating of the twelfth juror, who appellant stated was unacceptable. This ground of error was thereby properly preserved for review.

7. Such grounds may be shown by extrinsic evidence, Art. 35.18, V.A.C.C.P., as well as by the veniremember's answers on voir dire. Upon appeal, review will be based upon the *entire* voir dire of the veniremember as well as the extrinsic evidence, if any. *Anderson,* supra, 633 S.W.2d 854.

collect insurance, the explosive destruction of a planeload of people, or the burning down of an orphanage. He could not.

Veniremember Anderson also expressed a fixed opinion against the death penalty, and stated that he could not recommend a sentence of death and would vote against such a penalty in every case regardless of facts. He, too, upon being told that Texas' death penalty scheme requires the answering of questions of fact rather than an explicit recommendation of life or death, stated that he would answer at least one question "no", so as to prevent the imposition of a sentence of death.

Anderson further stated that it would be impossible for him to swear that he could render his verdict solely upon the law and the evidence in a capital case.

Upon appellant's attempt to rehabilitate, Anderson stated that he could determine guilt or innocence based upon the facts presented, and that he "could answer those three questions . . . yes, or no, based upon the evidence in the case and the evidence alone." When the State again took up the cudgel, Anderson held to his belief that he could find guilt or innocence upon the evidence, but, upon his being told again that "yes" answers to all of the punishment questions would *require* the court to assess the death penalty, the following exchange occurred:

"A. No, I don't think I could answer them all yes.

"Q. Are you sure about that?

"A. Yes, as far as right now, yeah.

"Q. Okay.

"A. I'm sure.

"Q. Then, at this time before the trial begins, are you telling us that you are irrevocably committed to vote, where all the questions would not be answered yes, so the death penalty would not be imposed, no matter what the evidence or the facts?

"A. Yeah, at this time. Yeah, I would have to say yes."

Upon further questioning by appellant (without further reference to the necessary effect of the answers) Anderson again stated that "I think I could" answer the questions yes or no according to the evidence as he found it. But when the State again began questioning whether Anderson could answer "yes" to the punishment questions knowing the result of those answers, the following colloquy occurred:

"A. (By the witness) I misunderstood your question.

"Q. (By Mr. Batchelor) You misunderstood Mr. Morris's question?

"A. Yes.

"Q. Then, are you saying now that at this time because of your beliefs against the death penalty you could not answer all of those questions yes if the evidence showed that they were yes, because the judge would have to inflict the death penalty?

"A. No, I don't think I could answer them all yes.

"Q. At this time, before you have heard any evidence in—

"A. Yes, sir.

"Q. And that's no matter what the evidence might show?

"A. Well, at this time, yes, sir.

"Q. No further questions."

The court then sustained the State's challenge for cause.

Veniremember Wafer first expressed uncertainty about whether she could participate as a juror in a trial resulting in a sentence of death. Upon explanation by the State of the nature and effect of the punishment questions, Wafer stated that she felt she would have to answer one of those questions "no", that she was irrevocably committed to vote against the death penalty regardless of the facts and circumstances that might be proved, and that her conscientious feelings against the death penalty would take priority over what happened at trial.

Upon appellant's attempt to rehabilitate Wafer, she was asked whether there was any reason she couldn't answer the punishment question, based upon the evidence, and replied "No, not from listening to the evidence, I couldn't, but—." What reservations Wafer intended to express remain unclear, because her answer was interrupted, as Pickett's had been, by the interposition of a question postulating the destruction of a planeload of people by explosives, of an orphanage by arson, or of insured offspring by poison:

"Q. [I]f you were on a jury on one of those types of cases, could you assess the death penalty?

"A. I don't think.

"Q. You could, couldn't you?

"MR. BATCHELOR: Your Honor, I believe she answered no, and then, Mr. Morris said she could. If she could answer herself.

"THE COURT: Can you answer the question? Is that the way you answered the question?

"A. (By the Witness) That's the way I answered it."

Although Wafer was equivocal in her answers at the beginning of the voir dire, once the nature and effect of the punishment phase questions were made clear to her, her response was consistent and clear. Based upon our consideration of the whole of the voir dire of the excluded veniremembers,[8] we find that each of them made clear that he or she would "*automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them," *Adams,* supra, 448 U.S. at 44, 100 S.Ct. at 2526, [emphasis in original], and their excusal under Art. 35.16(b)(3), V.A.C. C.P. did not violate the rule of *Witherspoon.* The grounds of error are overruled.

■ Appellant next contends the court erred in refusing to charge the jurors that, should they fail to find his confession voluntary, the State relied upon circumstantial evidence. Appellant submitted such a charge, which, except for spelling errors, tracked the then-approved charge on circumstantial evidence and instructed the jury to follow it in case it found the confession involuntary.

Charging the jury specially upon the law of circumstantial evidence, even where no direct evidence has been introduced, is no longer required by this Court. *Hankins v. State,* 646 S.W.2d 191 (Tex.Cr.App.1981). A fortiori, no error will lie where a *conditional* charge on circumstantial evidence is denied.

■ Appellant next contends the court erred in its charge to the jury upon voluntariness of the confession by omitting to state that a proper warning under Art. 38.22, V.A.C.C.P. should include the information that "[the accused] has the right to terminate the interview at any time."

No evidence was presented before the jury that the confession was not voluntary. Appellant was not entitled to *any* instruction on voluntariness, because the issue was not properly before the jury. *Brooks v. State,* 567 S.W.2d 2 (Tex.Cr.App.1978); *Lopez v. State,* 535 S.W.2d 643, 649 (Tex.Cr. App.1976). Further, the charge given was substantially the same as the one requested, and adequately protected the rights of appellant. See *Aranda v. State,* 506 S.W.2d 221, 226 (Tex.Cr.App.1974). No error is shown.

■ Appellant also contends the court erred in overruling his motion to quash the indictment for its joinder in a single paragraph of allegations of murder in the course of committing burglary and murder in the course of committing robbery. These allegations do not, as appellant contends, allege more than one offense, but rather allege alternative means of committing the offense of capital murder. *Russell v. State,*

8. We have set out excerpts of the voir dire to illuminate our discussion, but we do not imply that the passages quoted, or any isolated response of a veniremember, can override or obviate the consideration of the voir dire as a whole. See footnote 2, supra.

598 S.W.2d 238, 249 (Tex.Cr.App.1980); *Quinones v. State,* 592 S.W.2d 933, 944 (Tex. Cr.App.1980).

Appellant contends finally that the court erred in overruling his motion for mistrial based upon the State's jury argument at the guilt-innocence phase of the trial, which appellant contends "inferred [sic] there were things about appellant they didn't know."

During appellant's final argument, appellant's counsel attempted to portray the State's evidence as untrustworthy by ridiculing the testimony of an officer who had testified that appellant had slept in a patrol car while being transported from Waco to Corsicana:

"Another observation I would like to share with you—I was really amazed that Sheriff Ross said he went to Waco and arrested Paul and brought him back to Corsicana, and handcuffed behind, and he said the man—here's a man coming from Waco to Corsicana, charged with Capital Murder, handcuffed behind, and he's sleeping? Don't kid me. Sheriff, were you talking to him trying to get him to tell you about the matter? No. Well, if he wasn't talking to him, he should have been. Cause that's his job. But they have the audacity to tell you no, and that the man was trying to sleep? Now, the point is this. Suppose a friend comes to you and wants to borrow money, and he doesn't tell you he just lost his job, and he doesn't tell you he's fixing to leave town. Can you trust him anymore? If they try to misinform you about what happened with a man coming from Waco, would they misinform you about other things?"

The State, in its rebuttal, referred to this argument:

". . . . Mr. Morris said he was amazed at the statement that a man came from Waco handcuffed behind and sleeping. I'm amazed too? That that's the mark of this man right there. Didn't phase him. But we're not talking about him yet.

"We told you, this is about the crime. If you find him guilty, we'll get into him a little bit later.

"MR. MORRIS: Now, we object to that statement and ask the court to instruct the jury not to consider it for any purpose. Its an inference there are things the jury doesn't know, that he's going to tell them about it later.

"THE COURT: I'm going to sustain the objection, and the jury panel is so instructed.

"MR. MORRIS: Because of the magnitude of the statement made by the District Attorney, we ask for a mistrial at this time.

"THE COURT: Overrule. Motion denied."

The gist of the portion of appellant's argument cited, supra, is that a person would not normally sleep while being transported, in handcuffs, in a police car, and that testimony offered by the State that appellant had done so was therefore patently false. The gist of the rebuttal argument as set out is that an alternative explanation for the testimony was that it happened, and that it reflects more upon the nature of appellant than upon the truthfulness of the witness.

Viewing the arguments as a whole, we do not perceive the State's reminder that the identity of the actor and the character of the act, and not the character of the actor, was at stake in the guilt-innocence phase of the trial, and that the latter would become a subject of the second phase, if any, to have been so prejudicial insofar as it had not been invited by appellant's arguments as to have remained uncured by the court's sustaining the objection of appellant and instructing the jury to disregard. See *Goocher v. State,* 633 S.W.2d 860, 864 (Tex. Cr.App.1982); *Darden v. State,* 629 S.W.2d 46, 52 (Tex.Cr.App.1982). The ground of error is overruled.

The judgment is affirmed.