IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-90-144-CR





LOUIS R. TALLEY,



 APPELLANT


vs.





THE STATE OF TEXAS,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT



NO. 96,468, HONORABLE TOM BLACKWELL, JUDGE PRESIDING



 




 After finding appellant guilty of capital murder, Tex. Penal Code Ann.
§ 19.03(a)(6) (West 1989), the jury failed to find that appellant constituted a continuing threat to
society. See Tex. Code Crim. Proc. Ann. art. 37.071(2)(b)(1) (West Supp. 1993). Punishment
was assessed at confinement for life.

 Appellant asserts ten points of error, one challenging the sufficiency of the
evidence, five directed to the trial court's action in overruling objections to remarks and
arguments of the prosecutor, two complaining of the trial court's permitting the prosecutor to
reveal the contents of an inadmissible letter to the jury, and two based on the trial court's denial
of a motion to quash the indictment. We overrule appellant's points of error and affirm the
judgment of the trial court.

 In his first point of error, appellant asserts that the evidence is insufficient to
support the jury's verdict in that the State failed to prove that the offense was not voluntary
manslaughter. The court instructed the jury that the State has the burden of proving beyond a
reasonable doubt that the accused was not under the immediate influence of sudden passion arising
from an adequate cause when the fatal shooting occurred. See Bradley v. State, 688 S.W.2d 847,
851 (Tex. Crim. App. 1985). 

 It is undisputed that appellant caused the deaths of his estranged wife, Lillian, and
Merlin Anderson, by shooting them with a sawed-off shotgun at an apartment on South Congress
Avenue in Austin about 7:00 a.m. on May 7, 1988. Appellant testified that, about a year after
their 1967 marriage, he confronted Lillian about his belief that she was having an affair with
someone where she was working. Subsequently, Lillian admitted having an affair with her boss. 
On another occasion, appellant returned to their home in Splendora, a town about thirty-seven
miles north of Houston, in the early morning hours to find a man leaving their apartment. 
Appellant related many confrontations prompted by his suspicions of Lillian's infidelity and her
threats to leave. Appellant stated that he threatened her with a gun on numerous occasions. He
threatened her with a knife when he returned home from a hunting trip and found her packing her
bags. After a number of threats with a gun, Lillian dared appellant to shoot her. Knowing that
she could not swim and was afraid of the water, appellant threatened to throw her in the lake
while they were on a fishing trip if she did not stay with him. On another occasion, appellant
stated that he had Lillian perform oral sex upon him and, unknown to her, videotaped the episode. 
Later, appellant played the tapes for her and threatened to show the tapes to family members and
friends.

 On March 31, 1988, Lillian left while appellant was away from home. Appellant
hired a lawyer to file a divorce on April 8, 1988. Prior to Mother's Day, May 8, 1988, appellant
approached his sister and her husband, J.C. McGee, about the need of the children to see their
mother. The McGees agreed to arrange the meeting, but refused to divulge Lillian's whereabouts. 
Appellant hired Victor Peschke, a private investigator, to follow the McGees and the children,
appellant advising Peschke that he needed to locate his estranged wife in order that divorce papers
could be served on her. Following Peschke's report that the McGees and the children had
boarded a Continental airplane for San Antonio, appellant contacted the airline and learned that
they would return on a flight departing San Antonio on Sunday afternoon. In accordance with
appellant's directions, Peschke went to the airport in San Antonio in order that he might follow
Lillian after the children departed.

 Peschke called appellant about 7:00 p.m. from Brenham to report that the had
followed Lillian and Anderson from the airport in San Antonio to an apartment on South Congress
Avenue in Austin. Appellant stated that Peschke reported that Lillian and Anderson were
"smooching" and "drinking" on the trip to Austin. Appellant decided to go to Austin and confront
Lillian and Anderson. While waiting to talk to Peschke in person at 10:00 p.m., appellant went
to a shed behind his house where he sawed eight inches off the barrel of a shotgun. Appellant
testified that he took this action because he knew of Anderson's interest in guns. At the
conclusion of his meeting with Peschke, appellant told Peschke that he needed to get back with
the children and that he would contact him later about serving the divorce papers.

 After returning home and leaving a note for the children that he was going to Lake
Sam Rayburn, appellant, clad in a "camouflage slicker," drove to Austin, arriving about 3:00 a.m. 
After finding the apartment Lillian and Anderson were reported to have entered, appellant decided
to wait in his truck rather than run the risk of armed resistance on entering the apartment. Shortly
after 7:00 a.m., Lillian and Anderson emerged with laundry baskets. Appellant confronted them
with the sawed-off shotgun and ordered them to return to the apartment. Following their return
to the apartment, appellant related that Lillian told him that "he would never be any good . . . that
she loved this man . . . You're a lying son-of-a-bitch." Appellant stated he "had a rush of heat
go through my body . . . it's called an anger rush." At this point Anderson "made his move to
get the shotgun . . . I killed him." Appellant followed Lillian down the steps to the stair landing
where "I heard the shotgun go off . . . I'm the only one that could have pulled the trigger." 
Appellant threw the death weapon in a lake.

 Victor Peschke testified that appellant initially contacted him about finding his wife
in order to determine if she was "okay." Later, appellant advised him that he wanted her followed
from the airport in San Antonio to her new address in order that divorce papers might be served
on her. Clint Talley, aged nineteen at the time of trial, testified as a witness for the State. Clint
stated that his father (appellant) told him that he had threatened his mother several times with a
gun. Appellant also told Clint about threatening to throw his mother into the lake while they were
on a fishing trip if she did not stay with him. Clint related that he had observed bruises on his
mother when she returned from the fishing trip. Appellant told Clint "a lot of times, I guess
through . . . back up '87, '88, that if he ever caught her with a man, that he would blow the
man's brains out." When the McGees returned Clint and his sister Lori (age fifteen at the time
of trial) from their San Antonio visit with their mother, appellant acted as if he were surprised and
mad that they travelled on an airplane. About 11:00 p.m. on the night of their return, Clint heard
a truck leave the house. At a later date when his father and grandfather were discussing the
murder charges pending against his father, his father said "there would be no way he could be in
Austin" if "I saw my dad's truck in the driveway . . . May the 9th, about 6:00 in the morning." 
Clint was taken to his father's lawyer by his father and grandfather, and Clint told the lawyer that
he had seen his father's truck in the driveway at their home at the time in question. Following
Clint's appearance before a grand jury in Travis County in March or April 1988, Clint advised
his father that he had told the truth to the grand jury. Clint related that his father acted upset at
first, "and then he said if we wasn't going to do what Mr. Dick DeGuerin says, then he just as
well give up." Clint further related that his father and grandfather had a conversation about an
alibi for the shotgun missing from the shed. The alibi would be that the gun was traded at a flea
market.

 Dr. Thomas Blocker, a psychiatrist appellant saw after Lillian left, testified that
when appellant became suspicious of Lillian, "he made a choice at that time to basically imprison
her," and limited her association with people to his family. Appellant told Dr. Blocker that "he
had on many, many occasions threatened to kill her." On one occasion he had Lillian undress and
get in the bathtub, forced her to kneel down and put the gun in her mouth. Appellant explained
to Lillian that he did not want blood "all over everywhere" if he had to kill her. Appellant told
Dr. Blocker that when the gun failed to threaten her, he figured out a way how he would threaten
to drown her and "it would look like a boating accident."

 Appellant's sister, Joyce McGee, a witness for the State, testified that Lillian
worked with her in the office at the McGees' store. Appellant was "very much jealous . . . he
didn't like her to deal with a lot of our vendors because they were men." He liked her to go home
"real soon" after she got off work at "2:00 during the day." She had observed bruises on Lillian's
arms and, on one occasion, "red marks across the neck." Prior to any discussion about taking the
children to see their mother, Joyce told appellant that Lillian had left with a man friend. Lillian's
sister, Velma Webb, testified appellant told her, "Tell her she'd [Lillian] better come home soon
or there may not be nothing to come home to, the blood was going to run thick and red and she
would have to wade through it."

 When reviewing a challenge to the sufficiency of the evidence to support a
conviction, an appellate court must determine whether, viewing the evidence in the light most
favorable to the conviction, any rational trier of fact could have found the essential elements of
the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Butler
v. State, 769 S.W.2d 234, 239 (Tex. Crim. App. 1980). A reviewing court should not substitute
its determination of guilt for that of the fact finder unless it is found to be irrational or
unsupported by the evidence, such evidence being viewed under the standard set forth in Jackson. 
Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). "[I]t is enough that the
conclusion of guilt is warranted by the combined and cumulative force of all the incriminating
circumstances." Brandley v. State, 691 S.W.2d 699, 703 (Tex. Crim. App. 1985).

 We must determine whether the State has satisfied its burden to prove the absence
of sudden passion beyond a reasonable doubt. Gold v. State, 736 S.W.2d 685, 689 (Tex. Crim.
App. 1987). Sudden passion is defined as "passion directly caused by and arising out of
provocation by the individual killed or another acting with the person killed which passion arises
at the time of the offense and is not solely the result of former provocation." Tex. Penal Code
Ann. § 19.04(b) (West 1989). One of the ways the State may satisfy its burden is by showing
"that at the moment he intentionally or knowingly killed, appellant was capable of, and did in fact
act with cool reflection, in spite of circumstances that may well have been provocative." Gold,
736 S.W.2d at 690.

 The record is replete with evidence of appellant's threats to kill Lillian. He had
told his son that if he ever caught Lillian with another man, he would blow the man's brains out. 
Appellant's testimony reflects that he had learned of previous affairs. Several hours elapsed after
appellant received Peschke's report that Lillian and Anderson were "smooching" on the trip to the
apartment in Austin before the fatal shootings occurred. During this period of time appellant
prepared for a confrontation by sawing off a portion of the barrel of his shotgun. Appellant
anticipated the ultimate event and prepared for the occasion. He had used the deception of the
children needing to see their mother to learn Lillian's whereabouts. After finding their apartment,
appellant, dressed in a "camouflage slicker," waited almost four hours for Lillian and Anderson
to emerge from the apartment. After shooting Anderson, there was a time interval in which
appellant pursued Lillian down the stairs before he fired the second fatal shot. In Gold, ten or
fifteen seconds elapsed between the first shot and the second fatal shot. Under the facts, the court
found it was plausible, "even assuming a momentary loss of composure precipitating the initial
gunshot, appellant finished the job in a cool and calculated frame of mind." Id. at 690. Viewing
the evidence in the light most favorable to the verdict, we hold that a rational jury could have
found the absence of passion beyond a reasonable doubt. Appellant's first point of error is
overruled.

 In points of error two and three, appellant urges that the trial court erred in
overruling his objection to the prosecutor's statement that defense counsel was lying to the jury. 
Appellant contends that the prosecutor's statement denied his right to a fair and impartial trial
guaranteed by the United States Constitution and the Texas Constitution. In the course of the
trial, the matter of a dispute between appellant, who was mayor of Patton Village, and a municipal
judge over a speed trap became an issue. On direct examination of Montgomery County
Constable Travis Bishop, the witness was asked by defense counsel if the issue was that the judge
was operating the speed trap and appellant, as mayor, wanted it stopped. After the witness
answered that he did not know, the following occurred during cross-examination:


BY MR. KEEL [Prosecutor]:


Q: Mr. Bishop, what Mr. DeGuerin just said right there is the exact opposite
of what the situation was; isn't it? In other words, the judge was the one
against the speed trap.


MR. DeGUERIN [Defense counsel]: No, it wasn't the judge against the speed trap.


MR. KEEL: Judge, I am tired of him lying to this jury.


THE COURT: Overrule the objection.


MR. DeGUERIN: Wait a minute. I object to that kind of statement, Your Honor. That is an absolutely improper statement.


MR. KEEL: Don't point at me, Mr. DeGuerin. Calm down, Mr. DeGuerin. Sit down.


MR. DeGUERIN: Did you hear what he said, Judge?


THE COURT: I would ask you to sit down, also. Let him ask the question.


MR. DeGUERIN: I object to that statement, Your Honor.


THE COURT: Objection overruled. Let's proceed.



 Appellant urges that the complained-of statement called the credibility of the
defense into question. If the jury did not believe his testimony, appellant argues that he loses on
the essential element of sudden passion in his voluntary manslaughter defense. The prejudicial
effect of the alleged misconduct and the strength of the evidence of guilt are factors to be
considered. See U.S. v. Davis, 831 F.2d 63, 65 (5th Cir. 1987). While we cannot condone the
prosecutor's statements directed to defense counsel's untimely and unsworn testimony, we find
any harm resulting to appellant's credibility pales in comparison to evidence of the damage
appellant did in undermining his credibility. Appellant's attempt to have his teenage son fabricate
an alibi for his whereabouts at the time of the shooting along with the proposed perjured statement
about the disposal of the missing gun overshadowed any harm caused by the prosecutor's remarks. 
In addition, the jury could reasonably infer that appellant's representation to the McGees that the
children needed to see their mother was nothing more than a ruse to locate his estranged wife.

 The complained-of remarks followed defense counsel's injection of unsworn
testimony during the prosecutor's cross-examination of a defense witness. When defense counsel
testifies on behalf of the accused, his credibility as a witness becomes an issue and is the proper
subject of comment by the prosecutor. Satterwhite v. State, No. 70,951 (Tex. Crim. App., March
10, 1993). Earlier, during the prosecutor's cross-examination of appellant, defense counsel's
objection to a question by the prosecutor was, "Now, that's not true. That's an absolute
corruption of what his testimony was." While the prosecutor's remark was improper, it is
questionable whether it strayed beyond the scope of defense counsel's invitation. See Fuentes v.
State, 664 S.W.2d 333, 336 (Tex. Crim. App. 1984).

 The Court of Criminal Appeals has held that Tex. R. App. P. 81(b)(2) provides the
proper analysis for determining reversible error in jury argument. Orona v. State, 791 S.W.2d
125, 130 (Tex. Crim. App. 1990). Rule 81(b)(2) provides: "If the appellate record in a criminal
case reveals error in the proceedings below, the appellate court shall reverse the judgment under
review, unless the appellate court determines beyond a reasonable doubt that the error made no
contribution to the conviction or the punishment." The Orona court, in reviewing the application
of Rule 81(b)(2) to jury argument, stated:



To determine whether the error is harmless, we must calculate as much as possible
the probable impact of the error on the jury in light of the existence of the other
evidence. In the context of a harmless error analysis, it is important to note that
"other evidence" is the entire record. We focus our attention on whether the error
at issue might possibly have prejudiced the jurors' decision-making, and whether
the jurors were able to properly apply the law to the facts in order to reach a
verdict. It is the effect of the error and not the existence of overwhelming
evidence or the lack thereof that dictates our judgment.



Id. at 130 (citations omitted).

 We perceive no reason why the same standard of review does not apply to
gratuitous sidebar remarks by counsel. Applying the standards of Rule 81(b)(2), we conclude
beyond a reasonable doubt that the improper remark by the prosecutor did not contribute to
appellant's conviction or punishment. Appellant's second and third points of error are overruled.

 In his fourth point of error, appellant asserts that the trial court erred in overruling
his objection to improper closing argument by the State when the prosecutor argued that defense
counsel wanted information withheld from the jury. Dr. Richard Coons, a psychiatrist, testified
as a defense witness in support of appellant's defense of voluntary manslaughter. Appellant
directs our attention to the following argument by the prosecutor concerning Dr. Coons.



Now, Dr. Coons. I want to answer this argument. Mr. DeGuerin said Mr. Keel
respected Dr. Coons and agrees with him and only disagrees with him. Let me tell
you the last case Dr. Coons testified in.


MR. DeGUERIN: That's not evidence in this case. We object to that. Mr. Keel
is going beyond the record and we object to it.


THE COURT: I believe I will sustain the objection.


MR. KEEL: Oh, objection sustained. He doesn't want me to tell you about that.


MR. DeGUERIN: Judge, I will object to the comment. That's improper tactics.


THE COURT: Objection overruled.



 The appellant's objection to the first argument was sustained, and no further relief
was requested. Thus, appellant received all the relief he requested and nothing is preserved for
review. Lasker v. State, 573 S.W.2d 539, 543 (Tex. Crim. App. 1978). Prosecutor's statement
following the court's action in sustaining appellant's objection, "He [defense counsel] doesn't want
me to tell you about that," could be reasonably inferred by the jury to mean that the prosecutor
had information that would discredit Dr. Coons' testimony. Prior to the argument in question,
defense counsel argued:



There is no evidence that anyone else talked to Louis Talley before Dr. Coons did,
except the police officers.


Dr. Coons is the doctor who is respected throughout Travis County by this judge
and all the rest of the judges that appoint him on a regular basis. He served on a
committee with Judge Blackwell on these very same matters.


Mr. Keel tried to hire Dr. Coons. That's how much they think of him.



 Dr. Coons testified that he did "evaluations regarding mostly incompetency and
insanity for quite a variety of district courts in Travis County." In addition, Dr. Coons stated he
had been asked to see persons by the Travis County District Attorney's office and that Mr. Keel
tried to get him to see appellant, but he had already been retained by appellant. Dr. Coons related
that the county commissioners hire two psychiatrists to provide treatment for inmates, but "On
occasion I will pitch in on an emergency basis." While it may be urged that it is a logical
inference from the foregoing testimony that Dr. Coons is respected by the judges in Travis
County, we find that defense counsel's argument goes beyond this point in an attempt to bolster
Dr. Coons' testimony relative to appellant's claim of "sudden passion" at the time of the
shootings. Assuming, arguendo, that the prosecutor's argument exceeds the bounds of a
permissible response, "such will not constitute reversible error unless, in light of the record as
a whole, the argument is extreme or manifestly improper, violative of a mandatory statute or
injects new facts, harmful to the accused into the trial proceeding," Todd v. State, 598 S.W.2d
286, 297 (Tex. Crim. App. 1980). Applying the standard of Rule 81(b)(2), we conclude beyond
a reasonable doubt that the prosecutor's argument did not contribute to appellant's conviction or
punishment. Appellant's fourth point of error is overruled.

 In his fifth point of error, appellant contends that the trial court erred in overruling
his objection to the State's closing argument that appellant did not come up with a defense until
he hired a lawyer. The prosecutor argued:



 So, when your alibi gets busted and you can't say you weren't at the crime
scene, then you go to Tactic No. 2 and you say, okay, we did it, but it's a lesser
offense because it's voluntary manslaughter.


 Now, he is going to get up here and tell you that that was always game plan
No. 1. Because he had the defendant's psychiatrist go over there and take a
statement from him three or four days after the offense.


 Well, don't leave your common sense out here when you go in the jury room. 
Those people were hired by lawyers. And don't you know that Louis Talley had
talked to his lawyers before that. 



 Three days after the homicide, Dr. Coons saw appellant in the Travis County jail
at the request of appellant's then lawyers. It appears that appellant was without counsel at the
time he talked to Clint about the contrived alibi defense. Subsequently, appellant had Clint relate
the alibi to trial counsel. There is no evidence to support an inference that defense counsel had
any part in suggesting the alibi defense. Appellant, a lay person, was clearly capable of knowing
that if he was seen at his residence at the time of the crime, it would have been impossible for him
to have shot the victims. However, it defies reason to believe that appellant had any knowledge
about voluntary manslaughter being a lesser included offense. Nor would he have known that
sudden passion was an element of the lesser offense. We find it a logical deduction from the
evidence that trial counsel, upon learning that the alibi defense related by Clint was a fabrication,
relied upon appellant's information about his wife's infidelity along with Dr. Coons' findings to
assert the lesser included offense of manslaughter. The argument did not reflect adversely on
defense counsel and any inference that appellant fabricated an alibi is supported by the evidence. 
Appellant's fifth point of error is overruled.

 In his sixth point of error, appellant asserts that the trial court erred in overruling
his objection to the prosecutor's argument attacking defense counsel. Appellant's complaint is
directed to the following portion of the prosecutor's closing argument:



 That he caused the deaths under the immediate influence of the sudden passion
arising from adequate cause. Where is the immediacy? It's not there. It just isn't
there. It is not in this case. It is a perversion of the law to say that it could be. 
But Mr. DeGuerin is a good attorney and he did the best. He tried everything but
try the case.



In Love v. State, 533 S.W.2d 6 (Tex. Crim. App. 1976), the prosecutor argued:



 Now you know you have been treated to a great big helping of Defense tactics,
what we call a smoke screen, here and I have to admit that Mr. Zimmerman
[appellant's counsel] has come up with possibly the most novel tactic I have ever
seen.



Id. at 11. After noting that the trial court overruled defense counsel's objection, the court found
no reversible error in the argument. Id. at 11. Applying the standards of Rule 81(b)(2), we
conclude beyond a reasonable doubt that the complained-of argument did not contribute to
appellant's conviction. Appellant's sixth point of error is overruled.

 In points of error seven and eight, appellant asserts the trial court denied his right
to a fair and impartial trial by allowing the State to improperly reveal to the jury, under the guise
of cross-examination, a letter written by Lillian, after the trial court had ruled that the letter was
inadmissible.

 Appellant testified that Lillian left him a letter that he burned. Dr. Blocker and
Peschke testified that appellant told them that he had found a note in the car when Lillian left. 
Harold Byers, retained by appellant to file a divorce, testified that one of the reasons appellant
gave for wanting a divorce was that Lillian had left him a note stating that the kids would be better
off with him. Austin Police Officer Thomas Butler identified a letter found at the crime scene
with "Letter written when I left" appearing on the envelope. The court sustained appellant's
objection to the introduction of the letter found by Butler, stating that no further mention was to
be made of the letter until the court had an opportunity to rule on its admissibility. Following
appellant's objections to the prosecutor's cross-examination of appellant in which complaint was
made that the prosecutor was trying to leave the impression that he was reading from the letter
found at the scene of the murder, the court stated that it had already ruled that the note found at
the murder scene was inadmissible, but the prosecutor had the right to question appellant about
the note he acknowledged receiving when Lillian left.

 In Ruth v. State, 522 S.W.2d 517 (Tex. Crim. App. 1975), cited by appellant, the
court noted that the record was "replete with questions by the prosecutor both stating and eliciting
the specific nature of offenses allegedly committed by the appellant as a juvenile and the arrests
and dispositions in those cases." The court found the prosecutor's remarks were violative of the
statute providing that dispositions in proceedings against juveniles were never convictions for
crime and may not be used for impeachment when the person is subsequently prosecuted as an
adult. Id. at 518. The court held that the prosecutor's repeated presentation of the defendant's
juvenile offenses and their dispositions denied the defendant a fair trial. Id. at 519.

 In the instant cause, prosecutor asked appellant a number of questions about
whether the letter he received contained certain statements. Appellant voiced several objections
that the prosecutor was trying to get the contents of the inadmissible letter before the jury. The
court's response to appellant's objections was that the prosecutor had the right to cross-examine
appellant about the letter appellant stated he received. In response to one of the prosecutor's
questions, appellant stated that the only thing Lillian said in the letter was that "she was sorry for
making me like I was."

 When defense counsel voiced his objections, the prosecutor vigorously denied that
he was attempting to display the letter the court had ruled inadmissible. No bystander's bill was
made nor was any other proof offered to prove appellant's contention regarding the alleged actions
of the prosecutor. The scope of cross-examination is within the control of the court in the
exercise of its sound discretion. Toler v. State, 546 S.W.2d 290, 295 (Tex. Crim. App. 1977). 
Finding that the court did not abuse its discretion, we overrule appellant's seventh and eighth
points of error.

 In his ninth and tenth points of error, appellant asserts the trial court erred in
denying his motion to quash the indictment because the two paragraph indictment failed to put
appellant on notice of whether the alleged deaths occurred during a single criminal transaction or
during two separate and distinct criminal transactions. Murder may be enhanced to capital murder
when the accused murders more than one person "during the same criminal transaction; or during
different criminal transactions but the murders are committed pursuant to the same scheme or
course of conduct." Tex. Penal Code Ann. § 19.03(a)(6)(A), (B) (West 1989). The indictment
in the instant cause alleged both methods authorized by the statute to enhance murder to capital
murder.

 The Court of Criminal Appeals has consistently rejected contentions that trial courts
have erred in overruling motions to quash indictments alleging alternative means of enhancing
murder to capital murder. See Jernigan v. State, 661 S.W.2d 936, 942 (Tex. Crim. App. 1983);
Russell v. State, 598 S.W.2d 238, 249 (Tex. Crim. App. 1980); Quinones v. State, 592 S.W.2d
933, 944 (Tex. Crim. App. 1980). A charging instrument places a defendant on notice of what
the State will attempt to prove where the indictment alleges, in the conjunctive or disjunctive, the
statutorily defined types of conduct regarding an offense. State v. Carter, 810 S.W.2d 197, 199
(Tex. Crim. App. 1991). Appellant's ninth and tenth points of error are overruled.

 The judgment is affirmed.



 

 Tom G. Davis, Justice

[Before Justices Jones, B. A. Smith and Davis*]

Affirmed

Filed: May 5, 1993

[Do Not Publish]



















* Before Tom G. Davis, Judge (retired), Court of Criminal Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1988).